STATE ex rel. John E. WINFIELD,
Petitioner,

v.

Donald P. ROPER, Superintendent,
Respondent.

No. SC 88942.

Supreme Court of Missouri,
En Banc.

Sept. 1, 2009.

Rehearing Denied Oct. 6, 2009.

Joseph Luby, Sean D. O'Brien, Kansas City, MO, for Petitioner.

Chris Koster, Atty. Gen., Andrew W. Hassell, Asst. Atty. Gen., Jefferson City, MO, for Respondent.

ORIGINAL PROCEEDING
IN HABEAS CORPUS

PER CURIAM.

John Winfield was convicted of first degree murder and sentenced to death. His convictions were affirmed on appeal, *State v. Winfield*, 5 S.W.3d 505 (Mo. banc 1999), and he was denied post-conviction relief, *Winfield v. State*, 93 S.W.3d 732 (Mo. banc 2002).

Winfield now seeks a writ of habeas corpus. He claims that during the jury's penalty deliberations it had a split or deadlocked vote on the issue of the sentence; that this impasse was reported to the judge or bailiff; and that, without counsel being consulted or made aware of the split or deadlocked vote, the jury was directed to continue deliberating. Winfield fails to prove the allegation. The petition is denied.

**Facts**

Winfield was charged with and convicted of two counts of first degree murder, two

counts of first degree assault and four counts of armed criminal action in connection with a disagreement with his former girlfriend. *State v. Winfield* at 508–10. Following appointment to represent Winfield in connection with clemency proceedings, Winfield's counsel began an investigation concerning his case. Interviews with jurors persuaded counsel that the jury was not unanimous as to the penalty to impose, that the jury was instructed to continue deliberations notwithstanding its divided vote, and that these proceedings did not appear in the trial court record and occurred without Winfield's trial counsel's knowledge or participation. The respondent disputed the factual allegations.

This Court appointed a master to make findings of fact and conclusions of law as to Winfield's factual allegations.[1] The master, after hearing testimony from the trial judge, all the trial jurors, the bailiff, and others, filed a report concluding:

> [T]he jury did not advise the trial judge or bailiff of a split between death and life imprisonment (or that the jury was "hung" or "deadlocked" on the alternatives), that neither the trial judge nor the bailiff ordered the jury to continue their deliberations and, in turn, no such instruction was given.

### Standard of review

 The habeas corpus petitioner has the burden of proof to show that he is entitled to habeas corpus relief. *State ex rel. Nixon v. Jaynes*, 73 S.W.3d 623, 624 (Mo. banc 2002). Where the master has the opportunity to view and judge the credibility of witnesses, the findings and conclusions of the master are accorded the weight and deference given to trial courts in court-tried cases. *State ex rel. Busch by Whitson v. Busch*, 776 S.W.2d 374, 377 (Mo. banc 1989).[2]

### Discussion

 Winfield acknowledges that 10 years after the trial recollections of the witnesses may differ and may be imprecise. The record supports this assessment.

As initially framed, Winfield alleged that a note was sent to the trial judge indicating that the jury was deadlocked and that the judge returned a direction that the jury continue deliberating. The record before the master and at trial fails to show that this occurred.

The judge, bailiff and jury foreperson all categorically deny any such occurrence. The evidence indicates the foreperson was required to sign all notes to the judge. Three notes matching this requirement are contained in the trial record, but there is no note concerning the jury's deadlock. The foreperson did not recall any such note. The judge had no recollection of the note and indicated she would have preserved any such note in the record.

Those testifying for Winfield were less definite in their testimony. One witness testified there was a communication about the issue but could not remember how the communication occurred. A second witness testified to sending a note but thought the jury had only voted for the death penalty with respect to one victim when, in fact, it voted for the death penal-

---

1. The Court expresses its appreciation to the Honorable Gary M. Oxenhandler, Judge, 13th Judicial Circuit, for his service as master in this case.

2. *Accord State v. Griddine*, 75 S.W.3d 741, 742 (Mo.App.2002); *In re R.C.P.*, 57 S.W.3d 365, 371 (Mo.App.2001); *Matter of C–W–B–*, 578 S.W.2d 610, 612 (Mo.App.1979); *Ex parte Ray*, 573 S.W.2d 152, (Mo.App.1978); *Matter of W–K–M–*, 537 S.W.2d 183, 186 (Mo.App. 1976).

ty with respect to two victims. A third witness recalled a note, but could not recall if a response came back.[3] Winfield reframes the issue somewhat in his brief to emphasize that the evidence supports his allegation that the bailiff made a remark that instructed the jury to continue deliberating. But, again, the evidence is conflicting. Weighing evidence is not simply a matter of quantitative analysis but is primarily a qualitative analysis. *Clark v. Quality Dairy Co.*, 400 S.W.2d 78, 82 (Mo. 1966). Winfield argues that the evidence does not explain why multiple jurors would describe these events if they did not occur, but, of course, it is his burden to prove that the events did occur.

The record before the master does not prove even by a preponderance of the evidence that the jury was deadlocked, much less that the deadlock was communicated to the bailiff who unilaterally instructed the jury to continue to deliberate. Although, as Winfield notes, some jurors gave testimony that could, with certain inferences, support such a finding, there was substantial evidence that was qualitatively better and to the contrary. The bailiff denied the allegation, and other jurors similarly failed to recall any such directive or instruction by the bailiff.

The master's conclusion is supported by the record. Having failed to prove his allegations, Winfield's petition is denied.[4]

All concur.

### APPENDIX

**FIRST WITNESS**

Q: Do you remember the jury sending out any kind of communication or note regarding what your vote was?

A: We—at one time we did say we couldn't come to a complete agreement.

. . .

Q: Was there a response to the note?

A: To continue

Q: Who gave that response?

A: The—the—is it a bailiff that was in charge of the jurors, came back. I can't remember if it was a note or he told us we were to continue.

Q: So he could have been reading from a note or he could have just been talking?

A: Correct.

**Cross-examination**

[Note: There are three victims and two death penalties.]

Q: Now, you testified that you only remember one victim in this case; is that correct?

A. Yes. Well, I mean, there was more than one victim. I just remember one death.

. . .

Q: So would it surprise you if I told you there were actually two persons killed?

A: No, it would not.

. . .

Q: Did you return one death penalty verdict or two?

A: I don't remember.

[Note: The state showed the witness three other notes sent to the judge and dis-

---

3. Portions of the testimony of the witnesses most favorable to Winfield are attached as an appendix to this opinion.

4. Because the allegations are not proven, there is no basis to conclude that the Court's confidence in the punishment imposed is undermined.

cussed the method of sending notes to the judge.]

Q: Now, did the bailiff ever give you any instruction when he answered those three notes, oral instruction?

A: I don't recall.

## SECOND WITNESS

Q: Do you remember the jury sending out a note at some point or otherwise telling the Court that you guys were divided in your vote?

A: Yeah, I have a recollection of that. But, I mean, I think we asked for information on a couple of occasions and I think at one point we decided that we could just say we couldn't reach a unanimous decision and that it would be over, but that wasn't the case.

Q: And what happened after you decided that you might be able to say that or you might not be able to say that?

A: We conveyed the question to the judge, and I couldn't tell you how we did that, whether we told the bailiff or wrote it down. I don't remember. And the answer came back, You need to deliberate more.

Q: And who delivered that answer?

A: Again, I don't know if the bailiff did it verbally or if it came back as a note. I don't know. It's just been too long ago.

. . .

A: Yeah. I mean, my recollection is the judge communicated with us. I could not tell you whether that communication was in person or in writing.

Q: I understand.

A: And I—I recognize even what I've—what is typed on this document, and I still don't—I can't tell you whether the judge

came and talked to us personally or sent us a note.

Q: So you—it could have been the judge personally, it could have been the bailiff reading a note, it could have been the bailiff just talking to you.

A: Telling us what the judge said, yeah. I just don't know. I couldn't tell you.

### Cross-examination

Q: Okay. And you stated you have no— was people or were people irrevocably decided they could not vote for the death penalty?

A: Well, obviously not, because we ultimately reached a unanimous decision.

Q: And so you continued to deliberate?

A: Yes.

Q: And you don't have any idea how that communication went to the judge?

A: I have no recollection of how the communication with the judge was accomplished.

Q: And you don't have any recollection of how it was returned?

A: No.

## THIRD WITNESS

Q: Now, during that time before you-all were unanimous [as to the death penalty], did the jury send out a note or otherwise tell the bailiff that you guys weren't unanimous or that your vote was somehow split?

A: I believe we did send out a note saying that we weren't unanimous at that point.

Q: Do you remember exactly what the note said?

A: No.

. . .

Q: And after that note went out, did anyone come back—was there any response to that?

A: Not that I remember. I don't remember that.

Q: Do you remember whether the bailiff or the judge came and told the jury anything in response to a note?

A: If I had to say, I would say the bailiff.

Q: Do you remember exactly what the bailiff said?

A: No.

Q: Was it—but he said something?

A: Yeah.

Q: Okay. And as a result of that, did the jury stop or did the jury keep deliberating?

A: We kept going. If I recall, we kept going.

## Cross-examination

Q: And with regard to the communication you sent about a deadlock, did it state the jury was deadlocked? Did it use that word?

A: Yes, it did.

. . .

Q: It used the word "deadlocked"?

A: Yes.

. . .

Q: And was that a not vote for the death penalty ever or was it just uncomfortable at that time in the jury room?

A: I don't recall. I don't recall that.

Q: Okay. And are you—you already testified you don't remember what the bailiff said in response?

A: I do not.

Q: And the judge never came in the jury room, did she?

A: No.

Q: And there was no written communication that came from the judge saying to continue to deliberate, was there?

A: No.

## FOURTH WITNESS (for the state)

Q: Did you—did any jurors ever announce that they were—that the jury was deadlocked?

A: I mean, at the—when you first—when we first did the first time—what do you call it—the deliberation, it might have been, like, eight to four or something like that. It wasn't a total twelve yet, so we asked for more, you know, evidence and talked more about it, that type of thing.

Q: And as you did that, did any jurors state that they wouldn't change their vote or couldn't change their vote?

A: Not that I recall, no.

Q: And did you ever hear the phrase "hung jury"?

A: No.

Q: Do you remember sending a note to the judge indicating that the jury was deadlocked?

A: No, I do not. I just remember asking for evidence that the bailiff brought in.

Q: Okay. Do you remember sending a note to the judge, advising there was a split vote?

A: No.

Q: Did the bailiff ever instruct you to keep deliberating or continue deliberating or other words, phrases of they type?

A: I mean, I think they, you know, said, Keep deliberating, you know, that type of thing, you know, take your time. You know, they brought us dinner and that

type of thing, so just keep working on it and—

Q: So it was—how would you character— was that when he brought the food, did he say that?

A: Yeah, like, dinnertime.

Q: And he said something of the phrase of, Just keep working?

A: Right, because it was still early in the evening, so we were just to keep up as long as we needed to take to get our—you know, our answer.

. . .

Q: And was—how would you characterize the bailiff's statement to you? Was it more of a statement on your deliberations or a—just a matter of procedure about when you were going back to the hotel?

A: Yes, just procedure.

**Cross-examination** (by Winfield)

Q: Miss Tracy, the bailiff said to keep working on it?

A: (Witness nodded head.)

Q: That was about the time he brought in dinner?

A: Yeah, like around four or five, I believe.

Q: And when he said, Keep working on it, you took that to mean keep working on your task of deliberating the case?

A: Yes.

**Redirect**

Q: When the bailiff told you, Keep working on it, did you take that as a response to any question that you had asked the bailiff?

A: No.

Q: Was—was it—had you discussed—had you or the other members of the jury

discussed with the bailiff that the vote— that one of the votes had been split?

A: No.