STATE ex rel. Mark WOODWORTH,
Petitioner,

v.

Larry DENNEY, Warden, Respondent.

No. SC 91021.

Supreme Court of Missouri,
En Banc.

Jan. 8, 2013.

Rehearing Denied Jan. 29, 2013.

Opinion Modified on Court's Own
Motion Jan. 29, 2013.

See also 941 S.W.2d 679.

Woodworth was represented by Robert B. Ramsey of the Law Offices of Michael R. Bilbrey PC in Glen Carbon, Ill.

The state was represented by Theodore A. Bruce and Stephen D. Hawke of the attorney general's office in Jefferson City.

LAURA DENVIR STITH, Judge.

Mark Woodworth was convicted of murder, assault, burglary and armed criminal action for the killing of Catherine Robertson and the serious assault of her husband, Lyndel Robertson. Mark [1] has now filed a petition for writ of habeas corpus, petitioning this Court to vacate his convictions and grant him a new trial because newly dis-

---

**1.** To avoid confusing Mark with his father Claude Woodworth, Mark and Claude will be referred to by their first names.

covered evidence shows that the State violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding material, favorable evidence and further shows that that the lack of disclosure of this *Brady* material was prejudicial and resulted in a verdict not worthy of confidence.

This Court appointed a special master under Rule 68.03 to take evidence and issue findings of fact and conclusions of law as to the allegations Mark made. After hearing numerous days of testimony, the master issued a report in which he found that the State had violated *Brady* in at least two important and material respects and that the State's failure to produce this *Brady* material, particularly when considered in light of other newly discovered exculpatory evidence, was prejudicial because it bolstered a key defense theory that another person had committed the crime and that the prosecution had focused improperly on Mark to the exclusion of pursuing the person Mark contends is the real perpetrator.

The judge had the opportunity to view and determine the credibility of witnesses and this Court affords his findings and conclusions the weight and deference given to the findings and conclusions entered by trial courts in court-tried cases. Here, substantial evidence supports the master's findings that *Brady* was violated and that the violations were prejudicial. Accordingly, this Court orders that Mark's convictions be vacated and orders him discharged from the custody of the department of corrections unless the State elects to retry him.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts were adduced either at the first and second trials of Mark Woodworth or at the special master's hearings.

On the evening of November 13, 1990, Lyndel and Catherine Robertson were shot while sleeping in their rural Livingston County home. Mrs. Robertson was shot twice and died before paramedics arrived at the scene. Mr. Robertson survived three shots to the face and one to the shoulder. Investigators found no signs of forced entry, and there was no immediate indication at the scene as to who might have been the shooter.[2] The police did not find a murder weapon.

Claude Woodworm and his family lived across the street from the Robertsons. Claude and Mr. Robertson were farming partners and shared equipment space in a machine shed on the Robertson property. The Woodworms had a son, Mark, then 16 years old, a quiet boy who struggled in school, was considered "slow," and who lived at home with his parents and six younger siblings.

Investigators discovered a fingerprint on a partially full box of .22–caliber long rifle bullets allegedly located by Deputy David Miller on top of a workbench in the shed shared by the Woodworms and the Robertsons, but the print did not match any known prints on file at the time.[3] Ballistics tests revealed that the bullet frag-

---

**2.** A more complete factual background of the shooting and subsequent investigation can be found in *State v. Woodworth*, 941 S.W.2d 679 (Mo.App.1997).

**3.** At the hearing before the master, a Linn County sheriff's deputy testified that Deputy Paul Frey told him that he, not Deputy Miller,

had lifted the fingerprints from the box of bullets. Deputy Miller denied at both trials and Deputy Frey denied at the hearing before the master that this was the case, testifying that it was Deputy Miller who recovered the prints.

ments recovered from Mr. and Mrs. Robertson had the same type of brass wash coating as the .22–caliber Remington bullets found in the machine shed. Investigators also learned that Claude Woodworm owned a .22–caliber Ruger pistol that he kept in his bedroom and that Mr. Robertson kept an identical Ruger pistol in his pickup truck. The investigators sent the two pistols and the bullet fragments to the Missouri State Highway Patrol crime laboratory for testing. The bullets were so damaged and distorted that it was impossible to conclude whether either gun fired the rounds.

The investigation then lay fairly dormant until July 1992, more than 18 months after the murder. At the master's hearing, evidence was presented showing that, as the months passed by without any arrests, Mr. Robertson became frustrated by the lack of progress in the investigation and hired a private investigator to conduct a separate examination of the case. This investigator, Terry Diester, had a prior relationship with the chief deputy in charge of the Robertson investigation. Mr. Diester, though not a member of law enforcement, was provided unfettered access to the sheriff's files regarding the Robertson case.

In private conversations with the chief deputy, Mr. Diester suggested that Claude Woodworth's son Mark should be a prime suspect in the case due to his familiarity with and proximity to the Robertson home and machine shed. Shortly thereafter, the sheriff's office brought Mark in for questioning. Mark denied any involvement in the shooting and agreed to provide his fingerprints. A thumbprint lifted from the .22–caliber shell-casing box on the workbench in the shed shared by the Robertsons and the Woodworths was found to match Mark's thumbprint.

At that point, investigators obtained a search warrant to reexamine Claude's pistol and, shortly thereafter, obtained a bullet fragment that just had been removed from Mr. Robertson's liver. Ballistics experts tested this fragment, as well as the fragments recovered from Mr. and Mrs. Robertson shortly after the shooting, and compared the fragments to the bullets found in the shed and to bullets test-fired from Claude's pistol. The experts found some similarities between the bullets test-fired from that pistol and the bullet fragments but concluded the evidence was insufficient to allow them to determine to a reasonable degree of certainty that the shooter used Claude's pistol to commit the crimes. Their tests did show, however, that his pistol was not excluded as the murder weapon, that three of the bullet fragments recovered from the Robertsons had individual characteristics that matched individual characteristics of bullets test-fired from Claude's pistol, and that one cartridge from the box of bullets the deputy said he found on the workbench had a mark consistent with a manufacturing defect that matched a similar manufacturing mark on the bullet fragment recovered from Mr. Robertson's liver.

Following the thumbprint match and the return of the ballistics tests that could not exclude the Woodworth gun as the murder weapon, Mr. Robertson began to lobby the Livingston County prosecutor to charge Mark with the Robertson crimes. He also presented the prosecutor with written reports that detailed the evidence Mr. Diester had compiled against Mark. When the prosecutor did not act on the evidence within the next two months, Mr. Robertson asked the circuit judge, Kenneth Lewis, to present the evidence against Mark to a grand jury. Judge Lewis did just that, stating later that Mr. Robertson's requests were what motivated him to convene a grand jury one month after Mr. Robert-

son's request and to appoint the attorney general's office to represent the State in the matter rather than the regular prosecutor, who withdrew when he learned that the judge and Mr. Robertson were insisting he proceed against Mark.

On October 29, 1993, nearly three years after the shooting, Mark was charged by indictment with second-degree murder of Catherine Robertson, first-degree burglary and first-degree assault of Lyndel Robertson, and two counts of armed criminal action. Although Mark was only 16 years old at the time of the shooting, the juvenile division certified Mark for trial as an adult based on the violent nature of the crimes and the fact that Mark was by that time 19 years old.

At trial, the evidence against Mark was entirely circumstantial. In addition to the matching thumbprint on the box of bullets and the bullet fragment evidence, investigators said Mark gave them conflicting information about how many times he had been in the shed, how often he shot his father's pistol and his feelings towards Mr. Robertson. Mark testified in his defense. He denied any involvement in the shooting and explained that his print may well have been on the ammunition box found in the shed shared by his family and the Robertsons because he and other farm employees used to target shoot using bullets from .22–caliber ammunition boxes in Mr. Robertson's truck. He also attempted to introduce evidence showing that another young man, Brandon Thomure, had motive and opportunity to commit the crime.

Mr. Thomure was the former boyfriend of the Robertsons' daughter, Rochelle.[4] The day after the shooting, police examined Mr. Thomure and found evidence of gunpowder residue on his hands. The police received reports that Mr. Thomure

had abused Rochelle physically, that he impregnated Rochelle, that Rochelle terminated the pregnancy and that, not long before the shooting, Mr. and Mrs. Robertson offered to buy Rochelle a new car if she would break up with him. There was also evidence that while in the hospital Mr. Robertson told numerous people that it was "Brandon" who shot him or that he thought that it was "Brandon" who shot him. This made Mr. Thomure an early focus of investigation, but he claimed as an alibi that he was not in the area at the time of the shooting, and the police eventually stopped actively pursuing him as a suspect.

The trial court almost entirely excluded the evidence about Mr. Thomure and Rochelle and her family on the grounds that Mark could not show any direct evidence linking this young man with the crime. The jury only heard a single reference to Mr. Robertson's prior statement identifying Mr. Thomure. Mark, instead, based his defense on his belief that the evidence brought forth by the State against him was insufficient to establish guilt beyond a reasonable doubt.

The jury found Mark guilty on all counts, and he was sentenced to consecutive terms totaling 31 years. Mark appealed his convictions, arguing, among other things, that the prosecution failed to make a submissible case and that the trial court erred in excluding the evidence regarding Mr. Thomure.

In the first appeal, the appellate court held that the evidence was very "thin" yet minimally submissible. *State v. Woodworth*, 941 S.W.2d 679, 690 (Mo.App.1997). But the court agreed with Mark that trial court erred in excluding evidence pointing to Mr. Thomure as a suspect and held that

4. For reasons that are not entirely clear, Mr. Thomure also goes by the name Brandon Hagan. For purposes of consistency, this Court will refer to him as Brandon Thomure.

in light of the weakness of the state's case, the exclusion of this evidence was prejudicial. The court noted that evidence of an alternative suspect is admissible so long as there is proof that the other person committed some act directly connecting him with the crime. *Id.* at 690. This standard was satisfied by the evidence that Mark had been precluded from introducing at trial, including statements by Mr. Robertson shortly after the attack accusing "Brandon" of being or probably being the shooter. The court said that this evidence should have been admitted both for purposes of impeaching Mr. Robertson and as direct evidence linking Mr. Thomure with the crime. *Id.* The court reversed and remanded for a new trial at which the defense could introduce evidence showing Mr. Thomure's opportunity and motive to commit the crimes. *Id.* at 692.

On remand, a jury again found Mr. Woodworth guilty on all counts. The trial judge, who presided over both trials, imposed four consecutive life sentences plus 15 additional consecutive years. The court of appeals affirmed. The trial and appellate courts denied post-conviction relief. The trial court and court of appeals subsequently denied Mark's petition for writ of habeas corpus under Rule 91.01.

Mark now seeks habeas relief in this Court, alleging serious violations of the State's duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to disclose potentially exculpatory evidence to the defense.

This Court issued a writ of habeas corpus and, on November 2, 2010, appointed Boone County Circuit Judge Gary M. Oxenhandler to serve as special master to take evidence and issue a master's report on the claims in the petition for writ. In particular, Mark alleges that he discovered through a reporter's investigation after the second trial that the State had failed to disclose a trio of letters (the "Lewis letters") involving an assistant attorney general, Judge Lewis—who originally had been assigned the case—and Mr. Robertson. He also alleges that the State did not disclose evidence that Rochelle Robertson reported to police several violations by Mr. Thomure of the ex parte order of protection she obtained against him after the murder of her mother. In addition, he alleges that the State concealed the testimony of two persons that discredited Mr. Thomure's alibi and so was material and favorable to his defense. Mark asserts that the State's failure to disclose this evidence violated *Brady* and that these violations, as well as substantial additional newly discovered evidence casting doubt on Mr. Thomure's alibi and on the sufficiency and impartiality of the sheriff's investigation, resulted in a "verdict not worthy of confidence."

The master conducted seven evidentiary hearings between November 2010 and November 2011 and filed his report with this Court on May 1, 2011. That report finds that the prosecution did violate its duty under *Brady* as alleged and that these violations resulted in prejudice to Mark of a degree that undermined the master's confidence in the verdict. The master strongly recommends to this Court that Mark's conviction be set aside and that the case be reviewed by an independent prosecutor before any decision is made as to retrial.

## II. STANDARD OF REVIEW FOR MASTER'S REPORT

 This Court affords the findings of fact, conclusions of law and recommendations made by a judge this Court has appointed as a master under Rule 68.03 the "weight and deference which would be given to a court-tried case by a reviewing court" in light of the master's unique abili-

ty to view and judge the credibility of witnesses. *State ex rel. Winfield v. Roper,* 292 S.W.3d 909, 910 (Mo.2009). *Accord, State ex rel. Lyons v. Lombardi,* 303 S.W.3d 523 (Mo. banc 2010); *State ex rel. Busch by Whitson v. Busch,* 776 S.W.2d 374, 377 (Mo. banc 1989). As *Lyons* recently noted, in such cases, the master's findings and conclusions will be sustained by this Court unless there is no substantial evidence to support them. *Id.* at 525–26. This Court should exercise the power to set aside the findings and conclusions on the ground that they are against the weight of the evidence with caution and with a firm belief that the conclusions are wrong. *Id.*

## III. STANDARD FOR HABEAS RE-LIEF

 "Habeas corpus is the last judicial inquiry into the validity of a criminal conviction and serves as 'a bulwark against convictions that violate fundamental fairness.'" *State ex rel. Engel v. Dormire,* 304 S.W.3d 120, 125 (Mo. banc 2010) (quoting *State ex rel. Amrine v. Roper,* 102 S.W.3d 541, 545 (Mo. banc 2003)). It is the petitioner's burden to show that he or she is entitled to habeas corpus relief. *State ex rel. Nixon v. Jaynes,* 73 S.W.3d 623, 624 (Mo. banc 2002). "[A] writ of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government." *Engel,* 304 S.W.3d at 125. Habeas review, however, is not meant to serve as a substitute for post-conviction relief claims cognizable on direct appeal or in Rule 29.15 motions. To avoid "duplicative and unending challenges to the finality of a judgment," habeas review of a challenge to the validity of a conviction requires that a petitioner show a jurisdictional defect, cause for failing to timely raise the ineffective assistance or other constitutional defect and prejudice resulting from the defect, or manifest injustice such as either a freestanding or a gateway claim of actual innocence. *Id.; Amrine v. Roper,* 102 S.W.3d 541 (Mo. banc 2003).

 Mark principally seeks to overcome the procedural bar to his habeas claims by showing "cause and prejudice." To demonstrate cause, the petitioner must show that an effort to comply with the State's procedural rules was hindered by some objective factor external to the defense. *Id.* at 126. In other words, "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (citation omitted).[5]

Here, Mark alleges that the cause of the failure to raise this issue earlier was the State's failure to produce the exculpatory

---

**5.** Mark also argues that the additional evidence he now has discovered, some of it in regard to the alleged *Brady* violations and some of which is otherwise newly discovered evidence, shows by clear and convincing evidence that he is actually innocent. He is correct that a freestanding claim of actual innocence, if shown by a clear and convincing evidence, provides grounds for habeas relief without the need to prove any constitutional violation at trial, as is required under the "cause and prejudice" standard. *State ex rel. Amrine v. Roper,* 102 S.W.3d 541 (Mo. banc 2003). Alternatively, a showing of actual innocence by a preponderance of the evidence can substitute for "cause and prejudice," providing a "gateway" that entitles a habeas petitioner to review on the merits of the petitioner's otherwise defaulted constitutional claim. *Id.* at 546. Here, the master did not reach the claim of actual innocence, as he found cause and prejudice based on the *Brady* claims and had considered the newly discovered actual innocence evidence in regard to the prejudice prong of that claim, as discussed below. This Court does likewise.

evidence on which he now relies in response to Mark's discovery requests prior to both trials for all exculpatory evidence and witness statements. Such a failure to disclose exculpatory evidence, if shown, constitutes adequate cause for failure to earlier raise the error. *See State ex rel. Griffin v. Denney*, 347 S.W.3d 73, 77 (Mo. banc 2011) (State's failure to disclose evidence that an inmate other than the defendant possessed a weapon at the time of victim's murder in jail yard constituted "cause" to overcome objection that defendant did not raise the issue at trial).

To establish "prejudice," Mark alleges that the State's failure to disclose exculpatory information known to it undermined confidence in the verdict. The determination whether a constitutional violation is prejudicial under the cause and prejudice standard is identical to this Court's assessment of prejudice undertaken in assessing Mark's *Brady* claims. *Engel*, 304 S.W.3d at 126. This Court turns, therefore, to the *Brady* issue.

## IV. BRADY VIOLATION ANALYSIS

■ To prevail in his *Brady* claims, Mark must satisfy three components: (1) The evidence at issue must be favorable to him, either because it is exculpatory or because it is impeaching of an adverse witness; (2) that evidence must have been suppressed by the State, whether willfully or inadvertently; and (3) he must have been prejudiced. *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Engel*, 304 S.W.3d at 126.

■ In determining prejudice, the United States Supreme Court has stated: "A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles v. Whitley*, 514

U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Rather, to be entitled to a new trial under the *Brady* standard, a defendant must show "a 'reasonable probability' of a different result," *id.*, which means:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Id.* (internal quotations omitted). Accord, *Griffin*, 347 S.W.3d at 77.

■ The master found that both the Lewis letters and the police reports of the violations by Brandon Thomure of Rochelle Robertson's ex parte order of protection constituted evidence favorable to Mark, which should have been but was not produced by the State, and that suppression of it by the State, even if inadvertent, was prejudicial to the defense. The master also found substantial evidence to support Mark's allegation that the State suppressed testimony of two other persons who said they provided material and exculpatory evidence concerning Mr. Thomure to sheriff's deputies shortly after the shootings that, if accepted, cast considerable doubt on Mr. Thomure's alibi. The master did not address whether the failure to produce this additional testimony was a *Brady* violation but did set it out as matters he considered that supported his conclusion that Mark's verdict is not worthy of confidence. "When reviewing a habeas petition premised on an alleged *Brady* violation, this Court considers all available evidence uncovered following the trial." *Griffin*, 347 S.W.3d at 77. For the reasons discussed below, this Court concludes that

the master's *Brady* violation findings are supported by substantial evidence and are not against the weight of the evidence.

## A. *Lewis Letters*

 Mark asserts that the State violated his due process rights pursuant to *Brady* when it failed to disclose the "Lewis letters" to the defense prior to his first and second trials. For Mark to prevail in his *Brady* claim that the Lewis letters were wrongly not disclosed to him, he was required to show that the Lewis letters constituted evidence favorable to him, that they were not revealed, and that their suppression was prejudicial. Mark presented evidence that the letters were not produced, were material exculpatory evidence, and their lack of production was prejudicial. The State presented evidence that it believed it gave Mark's defense attorneys access to the letters because the prosecutors had a policy of opening their file to the defense, that the letters do not contain material or exculpatory evidence, and that their lack of production, therefore, was not prejudicial. As set out below, after extensive hearings the master credited Mark's evidence that Mark's attorneys did not receive the letters prior to either trial and concluded that the letters were relevant impeachment evidence and that the State's failure to disclose them was "highly prejudicial" to Mark.

The Lewis letters are a series of letters exchanged between the original trial judge, Judge Kenneth Lewis; Kenny Hulshof, then a Missouri assistant attorney general appointed as special prosecutor; and one of the victims, Mr. Robertson. These letters were brought to the de-fense's attention by a reporter in 2009 following a review of the State's files long after the conclusion of the second trial.

Judge Lewis, a longtime resident of Livingston County, was the trial judge originally assigned to try Mark's case. He presided over many of the initial proceedings, called the grand jury that indicted Mark, and presided over the juvenile hearing that certified Mark as an adult. In a letter dated September 24, 1993 (Lewis letter #1), Mr. Robertson wrote Judge Lewis expressing frustration with Livingston County prosecuting attorney Douglas Roberts' handling of the "case" against Mark. His letter said he felt that the prosecutor was "not giving this case his full attention," and he pleaded with Judge Lewis to remove Mr. Roberts so that the case could be brought before a grand jury.

When he learned of the letter, Mr. Roberts responded that he believed that "lack of enthusiasm" for a case was not sufficient grounds for disqualification, but in light of the case's importance to the community, he wrote to Judge Lewis on October 4 (Lewis letter #2), requesting that the judge appoint the attorney general's office to represent the State. The judge sought and obtained Mr. Hulshof's appointment as a special prosecutor in lieu of Mr. Roberts to prosecute Mark. In an October 7 letter addressed specifically to Mr. Hulshof (Lewis letter #3), Judge Lewis thanked the attorney general's office for agreeing to take on the case. In that letter, Judge Lewis enclosed a copy of Lewis letter #1 and stated that it was this letter that had "prompted [him] to bring about a grand jury inquiry." [6]

6. Although Mr. Roberts had disqualified himself as prosecutor three days prior to the day the grand jury convened, Judge Lewis for unknown reasons also wrote: "To say that [Prosecutor] Roberts has been uncooperative would be a monumental understatement. He boycotted the grand jury proceedings this morning, which is simply unheard-of in my experience." The master's report describes evidence of Judge Lewis and Mr. Roberts being involved in a "quarrel" and "rift," but the report does not give further explanation of

Testifying at one of the hearings before the master, Mr. Hulshof acknowledged that the Lewis letters were discovery materials that should have been disclosed. He also stated that he used a "Bates stamp" when providing discovery materials in a criminal case. The Bates stamp is used to number each page in sequence so that all disclosed materials can be tracked accurately. Mr. Hulshof agreed that none of the three Lewis letters was Bates-stamped and had not been produced in formal discovery.

The prosecutor for Mark's second trial, Rebecca Smith, who was then an assistant attorney general, also testified before the master. She admitted that she had prepared an inventory of prosecution file materials in response to a discovery request and that her inventory made no mention of the Lewis letters. She stated that she nonetheless believed that the letters had been made available to defense counsel when she had offered the defense the opportunity to look through that same prosecution file. But, on further questioning, she admitted to excluding documents from the files that she thought would be covered by attorney work product privilege. She also explained that although she assumed the Lewis letters were in the boxes of files that she allowed defense counsel to review—despite the fact that they were not in her inventory of the contents of the boxes and were not Bates-stamped—she could not recall whether defense counsel in fact found the Lewis letters during their review of the State's files.

Mark called his primary trial defense attorneys to testify before the master. They and the defense investigator testified that they did not learn about the Lewis letters or their contents until they were publicized by the news reporter, which did not occur until during the habeas proceed-ing investigation, well after both trials. Judge Lewis testified that he believed he had given the letters to Mark's juvenile certification proceeding attorney, Richard McFadin, although there was no written record of his so doing. The master found Judge Lewis' recollection regarding the letters was not accurate.

The master found that Mark had met all three elements of his *Brady* claim by showing that the Lewis letters were wrongly not disclosed to him; that they were material favorable impeachment evidence; and that their suppression, while not intentional, was prejudicial. This Court will defer to Judge Oxenhandler's findings as master as it would findings issued in a court-tried case, for in both instances he has the ability to view and judge the credibility of the witnesses. *Lyons*, 303 S.W.3d at 526; *Winfield*, 292 S.W.3d at 910.

*(1) Failure to Produce* Brady *Material.*

As noted, the master found that the State failed to produce the Lewis letters. In support, weighing all of the evidence, the master found that the letters were not made available to the defense. In so finding he noted the lack of a Bates stamp traditionally used by Mr. Hulshof to track disclosed material and the failure of Prosecutor Smith to list the letters in the inventory of the contents of the State's file that she made available for defense counsel's review. He did not credit Judge Lewis' testimony that the letters had been made available to defense counsel McFadin at the juvenile hearing, as there was no docket letter or cover letter memorializing such a delivery. The master also was not persuaded by Prosecutor Smith's testimony that the letters must have been in the file at the time defense counsel reviewed the

the origin of the problems between the two men.

non-privileged material in the file in 1999 prior to the second trial because they were in the file when she reviewed it prior to the special master's hearing.[7]

■ The master did not find that the failure was willful, but under *Brady* it is irrelevant whether the failure to produce exculpatory evidence occurred willfully or inadvertently; if the evidence potentially is exculpatory, it must produced. *Engel*, 304 S.W.3d at 126.

The State says that this Court should set aside the master's finding that the prosecution did not produce this evidence. It admits that there is no written evidence that the defense had the letters, and that multiple defense counsel testified that they did not have the letters, and that this Court will defer to the special master's determination of credibility and will adopt the master's findings if supported by substantial evidence. *Lyons*, 303 S.W.3d at 525–526. But the State says this Court nonetheless should reject the special master's finding because the defense could have offered even more proof to support its claim by (1) offering to open their defense file to the prosecution and by (2) calling Mark's initial defense counsel, Mr. McFadin.

The State admits it has no authority for the extraordinary proposition that a *Brady* claimant must open his entire defense file to the State, waiving any privileged mate-rials that might be contained therein, so that the State apparently can check the credibility of defense counsel's testimony that certain documents were not produced and are not a part of the defense file. Certainly this Court is aware of no case so holding. A duty to let the State see all defense evidence to bring a habeas action simply does not exist.

Similarly, Mark was not required to call every one of his defense counsel to claim that they had not seen the letters until the letters were discovered by a reporter long after Mark's trials. Of course, the master was free to consider the fact that Mr. McFadin was not called in determining the credibility of the evidence presented by Mark and by the State, and the report shows that he did so. The master did not find the State's argument based on a failure to open the entire defense file persuasive, however, nor did he find the failure to call Mr. McFadin undermined the credibility of those witnesses who were called and testified that the letters were not in the defense file.

■ This Court defers to the master's determinations of credibility. The master found Mark's witnesses, and the lack of record evidence of production of the Lewis letters, more persuasive. His conclusion is supported by substantial evidence and is not against the weight of the evidence.[8]

---

7. As the State notes, *Williams v. State*, 168 S.W.3d 433 (Mo. banc 2005), recognizes that the State can meet its *Brady* obligation when it has produced its file to the defense in response to a request for particular records, so that the defense can view them. And, *Williams* and *State v. Salter*, 250 S.W.3d 705 (Mo. banc 2008), recognize that *Brady* is not violated if defendant already was aware of the information that he says the State failed to disclose or if the information was not material. Here, however, the master noted that the Lewis letters were not Bates-stamped or included in the inventory of the records that were opened to defense counsel for inspection and that defense counsel was not aware of the Lewis letters prior to the discovery of the letters by the reporter during the habeas proceeding.

8. The master did not reach the conclusion that the State intentionally concealed the letters. However, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process ... *irrespective of the good faith or bad faith of the prosecution.*" *Brady v. Maryland*, 373 U.S.

This Court adopts his findings as to this prong *of Brady.*

### (2) *Evidence Favorable to the Defense.*

The master also found that Mark had presented substantial evidence that the Lewis letters were persuasive impeachment evidence that was favorable to the defense. The master believed the letters to be favorable to Mark because they diminished Mr. Robertson's credibility. In Lewis letter # 2, Mr. Roberts indicated that Mr. Robertson at one point had been adamant that Mr. Thomure be charged for the shooting crimes. Yet in Lewis letter # 3, Mr. Robertson declared to Judge Lewis that justice would not be served until the judge brought the evidence against Mark before a grand jury. These conflicting statements, in the master's opinion, would have aided in Mark's attempts at trial to impeach Mr. Robertson's credibility.

### (3) *Prejudice from Non–Disclosure.*

Mark also argues that his defense was prejudiced by the State's failure to disclose the letters. In determining prejudice, as noted:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at 434, 115 S.Ct. 1555 (internal quotations omitted).

The master determined that during both trials without the use of the Lewis letters Mark's attempts to impeach key prosecu-

tion witnesses, such as Mr. Robertson and police investigators, "were deprived of substantial evidentiary force." Had Mark been in possession of these letters at trial, they would have bolstered his attempts to impeach key prosecution witnesses such as Mr. Robertson, would have assisted the defense in demonstrating that the State's investigation was not impartial and would have shown that the investigation improperly focused on him rather than on Mr. Thomure once Mr. Robertson put pressure on Judge Lewis.

In support of his finding of prejudice, the master further pointed to evidence contained in the Lewis letters that would have impeached the credibility of Mr. Robertson's testimony at both trials that he did not remember telling doctors and police officers that it was Brandon who shot him and to a deposition prior to the first trial in which Mr. Robertson claimed that he never had "pointed [his] finger at anybody" as being the shooter. The master believed the letters supported the defense claim that it was the persistence of Mr. Robertson and not a fair, thorough review of the case that "prompted" Judge Lewis to call the grand jury. This would have provided important support for the defense's argument that the investigation of Mark was one-sided and highlighted that the evidence against him was weak and circumstantial. This detriment, the master determined, prejudiced Mark because the circumstantial evidence was so slim that "the slightest bit of evidence eroding the force of the State's witnesses or bolstering the weight of the defense witnesses may have tipped the scales in favor of [Mark]."

The master concluded that the State's failure to disclose the Lewis letters was itself a sufficient showing of prejudice to entitle Mark to a new trial and recom-

83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)

(emphasis added).

mends that this Court so hold considered alone or in combination with the *Brady* violation and additional evidence discussed below.

### B. Ex Parte Order of Protection

██ The master found a second *Brady* violation stemmed from the State's failure to disclose Rochelle Robertson's reports to police of violations of an ex parte order of protection obtained by her against her ex-boyfriend, Brandon Thomure. Rochelle obtained the order in December 1990, the month after the murder, because Mr. Thomure had "tried to get a hold of [her] continuously after [her mother Catherine Robertson] died." The order required that Mr. Thomure not "abuse, threaten to abuse, molest or disturb the peace [of] Rochelle" or enter upon her apartment property.

#### (1) Failure to Produce Brady Material.

Only after both trials, during a deposition taken as part of discovery in this habeas proceeding, did a Livingston County deputy reveal that Rochelle had made two complaints to police that Mr. Thomure violated the order of protection. Following the officer's testimony and pursuant to the master's order, the defense obtained files from the Livingston County circuit clerk that confirmed that Rochelle had reported to police after the murder, and long before Mark's trials, that Mr. Thomure had violated her order of protection against him.

The files revealed that in November 1991 Rochelle called the sheriffs office af-ter she received two telephone calls from friends of Mr. Thomure. The callers asked if Rochelle would speak to him; she denied the request on both occasions. The office filed a case report detailing the order of protection violation. In May 1991, the sheriff's office filed a second offense report after Mr. Thomure went to Rochelle's place of work and accosted her for hanging up on him when he called, stating "he stated that he would get even with her new boyfriend ... If he couldn't handle it, he would have some of his friends handle the job."

██ The now-sheriff of Livingston County testified that the reports should have been included in the Robertson shooting file because the violation complaints involved one of the prime suspects in the Robertson shooting. The State did not refute the sheriff's statement, and the master concluded that these reports fell within the scope of requested discovery material.[9] The master found that the lack of a Bates stamp and lack of these items on Ms. Smith's inventory of discovery materials confirmed the sheriff's statement that these materials were not placed in the prosecution file and not produced to the defense.

#### (2) Evidence was Favorable to the Defense.

The master found that the violation reports were favorable to the defense because they could have been used by Mark to strengthen his argument that Mr. Thomure had motive and opportunity to com-

---

9. "It is no hindrance to ... [a] *Brady* claim that the prosecutor did not have the same knowledge about his case as the investigators. The prosecutor's lack of knowledge ... is not an impediment because the prosecutor is considered 'the representative ... of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all.'" *State ex rel. Engel v. Dormire*, 304 S.W.3d 120, 127 (Mo. banc 2010) (quoting *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). *Brady* provides that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, *including the police.*" *Engel*, 304 S.W.3d at 127 (quoting *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555 ) (emphasis added).

mit the shooting and that they would have served to rebut the State's claim that Mr. Thomure had never threatened harm against Rochelle. The master also determined that Rochelle's failure to disclose the reports indicated her intent to protect Mr. Thomure from prosecution. The content of the reports provides substantial evidence to support the master's conclusion that the reports of the order of protection violations are favorable to Mark's defense.

### (3) Prejudice from Nondisclosure.

Lastly, Mark must prove that that he was prejudiced by the nondisclosure. The State argues that, while Mark was not told of and did not know of the complaints to police, he knew of the violations because Rochelle had testified to them at her deposition in 1994 and any failure to inform him of complaints to police could not have been prejudicial. The master rejected this argument, for it misses the issues on which a defendant would have used this evidence.

At her 1994 deposition, Rochelle testified that Mr. Thomure had called her in violation of the protective order, but she said that he never had made any threats and that she did not report the calls to police. She left the impression that the calls were unimportant and were not disturbing to her. This undercut the defense's ability to refute the State's evidence that Mr. Thomure never had threatened the Robertson family. The new evidence that indicated Rochelle in fact had reported Mr. Thomure's harassment to the police—harassment that threatened bodily harm—directly contradicted her 1994 deposition statements and supported the defense argument that Mr. Thomure had the motive to commit the shooting.

The master noted that the defense could argue that Rochelle's lack of candor about reporting the order of protection violations calls into question her overall credibility and raises critical questions regarding her willingness to shield Mr. Thomure, which the jury should have had a chance to consider. Lack of knowledge of the threats made by Mr. Thomure to Rochelle at her work, which indicate Mr. Thomure's willingness to resort to violence, prejudiced Mark's efforts to show that Mr. Thomure was a viable alternative perpetrator and that his willingness to commit violence against those who came between him and Rochelle—as Mr. and Mrs. Robertson had tried to do shortly before the murder—went so deep it even survived Rochelle's mother's murder.

The master considered the prejudice caused by the failure to reveal this important evidence in light of what he, and the appellate court on the first appeal, noted to be a very thin and totally circumstantial case. Given the weakness of the case, the master concluded that the information about Rochelle's lies as to her complaints about violations of the ex parte order of protection may have tipped the scales in Mark's favor and the failure to disclose this evidence resulted in prejudice. Substantial evidence supports the master's determination of prejudice.

The master found this was itself a sufficient showing of prejudice to entitle Mark to a new trial and recommends that this Court so hold considered alone or in combination with the *Brady* violation discussed above and the additional evidence discussed below.

### C. Additional Witness Testimony to Be Considered in Determining Prejudice

Some of the additional evidence considered by the master involved alleged additional *Brady* violations, but the master did not find it necessary to consider whether they reached that level in light of his finding of the two *Brady* violations just

discussed. He nonetheless found them relevant to his determination whether the verdict in the second trial was worthy of confidence and found that it was not.

■ This Court need not determine whether it agrees that each *Brady* violation considered in isolation had a sufficiently prejudicial effect to entitle Mark to a new trial, for in *Griffin*, this Court noted that in deciding whether the prejudice shown by *Brady* violations is sufficient to determine that the prior verdict is not "worthy of confidence," the courts should consider the effect of all of the suppressed evidence along with the totality of the other evidence uncovered following the prior trial. *Griffin*, 347 S.W.3d at 77. This Court, therefore, will consider the effect of the failure to disclose the Lewis letters along with the failure to disclose the police reports of Mr. Thomure's violations of the ex parte order of protection, both of which are *Brady* violations for the reasons found by the master, as well as the effect of the other pieces of recently discovered evidence considered by the master, in determining whether the prior verdict is no longer "worthy of confidence." *Id.*

The master found that, as might be expected in a small town, the habeas corpus proceeding created a great deal of publicity in Chillicothe, and a number of residents came forward with what they claimed to be direct knowledge of facts and circumstances regarding the shooting. Among those persons was June Cairns. Ms. Cairns testified at the hearing before the master that the morning after the shooting, she saw Mr. Thomure in her home visiting her son. Ms. Cairns found this odd because it was around 6:30 a.m. to 7:30 a.m., much earlier than when Mr. Thomure usually came to visit. If Mr. Thomure was indeed in Chillicothe at this time, it would contradict his trial testimony that he was nearly two hours away in Independence, Missouri, at the time of the Chillicothe murder.

Ms. Cairns stated that she reported this sighting of Mr. Thomure to the sheriff's office shortly after learning of the Robertson shooting. Ms. Cairns says she also recounted to the sheriff a telephone call that Mr. Thomure made from her home about two weeks prior to the shooting in which she heard him threaten to slit the listener's throat. Ms. Cairns presumed from the portion of the conversation that she overheard that the person on the other end of the line was the victim, Catherine Robertson, but she could not say for sure.

The sheriff's report mentions only that Ms. Cairn's son stated he saw Mr. Thomure in Chillicothe the *afternoon* after the shooting. It did not mention her alleged report that she saw him in Chillicothe the morning after the shooting and it did not mention the telephone threat she heard Mr. Thomure make. No report of her statements is in the file. The defense was unaware of her evidence until this habeas proceeding, as apparently was the prosecution.

Another witness who came forward during the habeas proceeding was Connie Grell. Ms. Grell testified at the hearing that Rochelle had visited her hair salon approximately two weeks before the shooting. At that time, Ms. Grell says, Rochelle stated that there "was a lot of hate between her parents and [Mr. Thomure]" and that Mr. Thomure "wished they were dead or could kill them." Ms. Grell says she reported this statement to the sheriff after the shooting. Again, no report of her statement is contained in the sheriff's file, and none was turned over to the defense or prosecution.

Mark argues that these previously unreported statements constitute additional *Brady* violations by the State. Clearly

they were exculpatory and greatly support the defense's theory that Mr. Thomure, not Mark, was involved in the shooting. Their failure to be disclosed would be a serious *Brady* violation and prejudicial in and of itself if known by an agent of the State such as a sheriff's deputy. *Engel,* 304 S.W.3d at 127.

The State claims, however, that these statements were not suppressed because the witnesses now are lying about what they told sheriff's deputies at the time of the murder. If not told to investigators and, therefore, not in the possession of an agent of the state, then, of course, the State would not have failed to reveal this evidence. The master detailed these witness statements in his report, but he made no determination as to whether the witnesses accurately recount now what they told sheriff's deputies at the time. Whether or not they constituted *Brady* violations, he found he could consider these witness statements as a part of the "totality of the circumstances" he reviewed to determine whether Mark had shown sufficient prejudice to be entitled to habeas relief.

The master additionally considered substantial other newly discovered evidence, including the testimony of numerous individuals who made statements regarding the case that either were not known at the time of the trials or were not properly recorded by the sheriffs office. For instance, a friend of Mr. Thomure testified that in 2007 Mr. Thomure threatened to kill him, stating that he "got away with one murder, what makes you think I can't do it again?" Another individual stated that he had seen Mr. Thomure at a Chillicothe bowling alley on the night of the shooting, contrary to Mr. Thomure's alibi.

Also contradicting Mr. Thomure's alibi was the former Chillicothe High School assistant principal who testified that he ran Mr. Thomure out of the school in Chillicothe the morning of the shooting. A high school student and Robertson neighbor supported the principal's sighting of Mr. Thomure at the school when she testified that Mr. Thomure pulled her out of class the morning after the shooting to ask whether she had seen anything at the time of the crimes.

None of this evidence was heard by the jury in either trial. The master found such evidence is very relevant to the question whether Mark is not guilty of the crime for which he was convicted. Clearly, if believed, this evidence would combine with the evidence presented at the second trial and with the *Brady* evidence discussed above to cast doubt on Mr. Thomure's alibi and on the thoroughness and lack of bias of the investigation. It would be up to the jury, of course, in any new trial to determine the reliability of these witness' memories, the propriety of the sheriff's deputies' actions, and the relevance of Mr. Thomure's alleged lies about his alibi in light of the multiple sightings of him in Chillicothe the morning of the murder.

In addition, the master expressed great upset and shock as to the extent of control that a private investigator, Mr. Diester, was permitted to exert over the investigation of the attack on the Robertsons. The master found that Mr. Diester, whom he specifically found not to be credible, "was clandestinely given access to the Sheriff's investigative file [including the Woodworth pistol and the bullet fragments] [10] . . . and,

10. The master did not reach Mark's additional claims that it first came to his attention only in the habeas proceeding that in addition

to the sheriff's file, the sheriff's office also gave Mr. Diester control of the Woodworth pistol as well as the bullet fragments recov-

along with the Sheriff's deputies, disclosed and deep-sixed witness testimony as deemed necessary to keep tune with the theme of the investigation: [Mark] Woodworth did it." The master found that these actions constituted serious investigative misconduct and that "over time Diester morphed into the role of prosecutor," dismissing other leads and ensuring that Mark was charged with the crimes. The master found that this bias in the conduct of the investigation undermined the verdict and further supported his conclusion that the verdict was not worthy of confidence.

## V. CONCLUSION

After days of hearings and an extensive review of the case, the master concluded that the State failed to properly disclose to the defense the Lewis letters and the reports of the violations of Rochelle Robertson's ex parte order of protection violations by Mr. Thomure. The master also determined that the State's failure to disclose this evidence prejudiced Mark. These findings are supported by substantial evidence and are not against the weight of the evidence. The master noted that neither Mr. Hulshof nor Ms. Smith had placed Bates stamps on the Lewis letters, Ms. Smith's inventory of prosecution file materials made no mention of the letters, and the master credited defense counsel's testimony that they never had seen the letters until during the course of this habeas proceeding. The order of protection violations also did not contain a Bates stamp and were not on Ms. Smith's inventory list, and the current Livingston County sheriff admitted that these reports should have been included in the sheriff's file. The State did not dispute that the

police complaints were absent from the file.

The master found that the lack of this evidence impaired Mark's attempts to impeach key prosecution witnesses and that due to the weakness of the case against him, any additional advantage that could have been gleaned from this evidence might have resulted in a verdict of "not guilty." Additionally, the master recognized numerous other pieces of evidence, including statements from neighbors and Chillicothe residents who provided previously undisclosed evidence that tended to support Mark's claim of innocence, evidence which he believed supported Mark's argument that his second trial did not result in a "verdict worthy of confidence."

The master considered that this suppressed evidence along with the totality of the other evidence uncovered following Mark's last trial showed cause and prejudice and showed a violation of *Brady* that caused sufficient prejudice to undermine confidence in the outcome of the second trial and render the prior verdict no longer worthy of confidence. This determination is supported by substantial evidence, is not against the weight of the evidence, and does not erroneously declare or apply the law. This Court, therefore, adopts the master's recommendation and orders that Mark's convictions be vacated. The state has indicated an intent to retry Mark; therefore, on the date the mandate issues in this case, Mark shall be returned to the custody of the sheriff of Livingston County and be entitled to such release as the circuit court shall determine pursuant to Rule 33.

ered from Mr. and Mrs. Robertson. The state admits that Mr. Diester had possession of the gun and bullet fragments but disputes whether this information was known earlier and says in any event chain of custody of these

items was stipulated. The master did not address this issue and, as the stipulation issue presumably will not recur in any future retrial, there is no need for this Court to do so either.

TEITELMAN, C.J., RUSSELL, BRECKENRIDGE, FISCHER and DRAPER, JJ., concur.

WILSON, J., not participating.