Patricia Breckenridge, Chief Justice
Reginald Clemons was convicted of two counts of first-degree murder and sentenced tp death for the April 5„ 1991 murders of sisters, Julie Kerry and Robin Kerry. Mr. Clemons filed a petition for a writ-of habeas corpus-in this Court, seeking to vacate his convictions because he claims that newly discovered evidence shows that he was prejudiced when the state .violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding material evidence. In the alternative, Mr. Clemons requests that this Court vacate his death sentences because his sentences are disproportional due to his age and lack of criminal record, new evidence that Mr. Clemons’ confession was coerced, evidence that Mr. Clemons’ did not directly murder the Kerry sisters but acted only as an accomplice, and because of the reduced sentence of a “more culpable” codefendant. .
This Court appointed a special master under Rule 68.03 to take' evidence and issue findings of fact and conclusions of law as to Mr. Clemons’ allegations. After hearing multiple days of testimony and reviewing thousands of pages of record, the master issued a report in which he found that the state had violated Brady by failing to produce evidence favorable to Mr. Clemons that a witness observed an injury to Mr. Clemons’ face shortly after a police interrogation and that the witness documented his observations of the injury in a written report that was later altered by the state. The master determined that the state’s failure to disclose this evidence was prejudicial to Mr. Clemons because it could have led to the suppression of Mr. Clemons’ confession, a critical part of the state’s case against Mr. Clemons. Substantial evidence . supports the master’s findings that the state deliberately violated Brady and that, in the absence of the undisclosed material evidence, the jury’s verdicts are not worthy of confidence. Accordingly, this Court vacates Mr. Clemons’ convictions .and sentences for first-degree *64 murder.[1] Within 60 days from the date the mandate issues in this case, the state may file an election in the circuit court to retry him. If the state does not so elect, the case against Mr. Clemons shall be dismissed, and Mr. Clemons shall be discharged on this matter.
Facts and Procedural Background[2]
Around 11:35 on the evening of April 4, 1991, 20-year-old Julie Kerry and her 19-year-old sister, Robin,[3] took-their visiting cousin, Thomas Cummins, to the Chain of Rocks Bridge in St. Louis.[4] The sisters wished to show Mr. Cummins a poem they had written on the bridge several years, before. The cousins arrived at the bridge around midnight.
As the cousins began to walk east on the bridge, they saw a group of four men coming from the Illinois side. Mr. Cum-mins later identified the men as Reginald Clemons, Marlin Gray, Antonio Richardson, and Daniel Winfrey. The two groups' had a brief conversation on the’ bridge. Mr. Winfrey asked the Kerry sisters for a cigarette. Mr. Gray demonstrated to the others how to climb over the bridge railing and come back up through a manhole in the deck of the bridge. He commented to' Mr. Cummins that the manhole was a “good place to be alone and'take your woman.” The groups then parted ways.
The cousins continued walking toward the Illinois side when they heard footsteps approaching them from behind. It was the four men. Mr. Winfrey later testified that the four men decided to return to the cousins after Mr. Clemons suggested they rob them and Mr. Richardson suggested they rape the girls. At first, the four men were, again, friendly to the cousins. As all seven began walking together toward the Missouri side, Mr. Gray grabbed Mr. Cum-mins by the arm, walked him back a short distance, and ordered him to the ground. Mr. Cummins immediately complied and remained facedown after Mr. Gray warned Mr.. Cummins.that he would kill him if he looked up.
Mr. Cummins then heard his cousins begin to scream. Mr. Cummins believed he continued to be guarded by Mr. Gray, while the other men raped the Kerry sisters. Eventually, Mr. Gray left and Mr. Cummins was guarded by other members of the group. He heard one of the men say that’ he had never had the pleasure of “poppin’ somebody.” He did not know who said this but he did not believe it was Mr. Gray.
Mr. Cummins heard sounds of a struggle and Julie continuing to scream. One of the men told, one of the- KJerry sisters to take off her pants and threatened to throw her off the bridge if she did not comply. One of the men returned to Mr. Cummins and asked Mr. Cummins if he had any money. The man then took $20 and a *65 Swatch watch from Mr. Cummins.[5] When the man removed Mr. Cummins’ wallet from his pocket, he discovered a badge and “freaked.” Another man demanded to know if Mr. Cummins was a police officer and was told that Mr. Cummins was a firefighter, not a “cop.” Several of the men approached Mr. Cummins. One told Mr. Cummins that he had Mr. Cummins’ driver’s license and would come and get him if Mr. Cummins told anyone what had happened. Mr. Cummins was then told to get up and to keep looking down as he was moved along the bridge toward the Missouri side. He was then forced to lie down again. Two of the men talked to Mr. Cummins about whether he would live or die and argued over whether to kill Mr. Cummins.
Mr. Clemons then approached Mr. Cummins and told him he had raped his girlfriend and asked how that felt. Mr. Cummins told him that she was not his girlfriend, she was his cousin. Mr. Clemons then told Mr. Cummins to. get up and keep his head down. Mr. Clemons walked Mr. Cummins over to an open manhole in the bridge and had him sit on the edge of the manhole. . Mr. Cummins was then told to go through the manhole onto a steel platform suspended about five feet below the surface of the bridge. When he did this, Mr. Cummins saw the Kerry sisters lying on their backs on the platform.
Other than the Kerry sisters, Mr. Cum-mins did not see anyone else on the metal platform at that time. After laying down on the platform, he heard two thuds that he believed were two sets of feet droppiiig onto the platform. He felt the cousin who was lying next to him move back and forth, which he believed was-caused by someone raping her. Mr. Cummins and the cousins were then told to step -down onto a concrete pier about three feet below the platform. Although he could only see one of the men, he believed two of them were still on the platform. Without warning, he saw an arm push Julie and then Robin off the bridge.[6] He was told to jump by the man that he later identified as Mr. Richardson, and he did. ,
When he surfaced in the Mississippi River, Mr. Cummins briefly had contact with Julie but then lost sight of her. He never saw Robin. Authorities recovered Julie’s body from the. river near Caruthersvfile three weeks later. Robin’s body was never found. Eventually, Mr, Cummins was able to reach the bank on the Missouri side of the river south of the Chain of Rocks Bridge. He climbed up the bank and found a road. Shortly before ,2:00 a.m., Eugene Shipley was driving a truck south of the Chain of Rocks Bridge near the St. Louis Waterworks when he saw Mr. Cum-mins step onto the road to flag him down. Mr. Shipley observed that Mr. Cummins’ hair was wet and unkempt and he was crying. Mr, Cummins told , Mr. Shipley that he needed help, that his cousins had been raped, and that he had been thrown off the bridge.
Officers from the St. Louis Metropolitan Police Department responded to the scene after being contacted by Mr. Shipley. *66 When the police officers arrived at the Chain of Rocks Bridge, they questioned Mr. Cummins. After it got light, the police took Mr. Cummins onto the bridge and he showed them where the events took place. The police found a number of items on the bridge including a set -of keys carried by Mr. Cummins, an unused condom, a used condom, a pen, 'some change, and a cigarette butt. A black flashlight engraved with “Horn I” was also discovered several hundred yards east of the other items.- ■ • '
Even though Mr. Cummins was questioned at the Scene, his first recorded statement was taken at the police station around 9 a.m; by Detectives Raymond Ghrist and Gary Stittum. While Mr. Cum-mins was being interviewed by Detectives Ghrist and Stittum; another officer attempted to enlist assistance in searching the river for the Kerry sisters. When he contacted the Missouri State Water Patrol, he spoke with an officer and was told information about the river currents arid the water temperature that caused him to doubt Mr. Cummiris’ statements. Other erroneous information, including the belief that Mr. Cummins was lying because he could have simply fought off the four assailants given that none of them ever pulled a weapon, caused the police to obtain another recorded statement from Mr. Cummins.
Mr. Cummins’ second recorded statement wás conducted by Detectives Richard Trevor and John Walsh. This statement lasted until 12:40 p.m. and was largely consistent with what Mr. Cummins had first told Mr. Shipley and the responding officers at 2:00 a.m. just after the police were contacted. Nevertheless, a" May 31, 1991 incident report that purportedly summarized Mr. Cummins’ statements in the second recorded interrogation, materially mischaracterized his statements to indicate he said that he and Julie had become close when they were both visiting. Florida the year before and that they were close to having sex. It also incorrectly stated that Mr. Cummins changed his story and said that he had not jumped off the bridge and, instead, ran from the bridge and got wet only when he jumped into the water from the bank to search for the Kerry sisters.
The police then obtained Mr. Cummins’ Consent to submit to a polygraph examination. Although Mr. Cummins’ condition and the circumstances under which the polygraph was performed were such that its results should not have been given any cre'dehce, the police proceeded. When the test was completed, the examiner told Mr. Cummins that the test showed he was “deceptive.” The police then talked with Mr. Cummins’ father and told him information that temporarily convinced him that his son could not have survived a jump from the bridge and that his son’s polygraph test was classified as deceptive. Mr. Cummins’ father talked to Mr. Cummins and urged him to tell the truth. The police then claimed that Mr. Cummins changed his story to say he ran off the bridge, jumped in the water only up to his neck, and then ran for help. Later under oath, Mr. Cummins vehemently disputed having ever made these statements.
According to police reports prepared after Mr. Cummins had been cleared by the police for the deaths of‘the Kerry sisters, Lieutenant Steven Jacobsmeyer, deputy commander of the Crimes Against Peoples Unit, and Detective Chris Pappas and Detective Joseph Trevor interrogated Mr. Cummins again after they became aware of Mr. Cummins’ allegedly changed of story. The report stated that, although Mr. Cummins refused to make a recorded statement, he told these officers that he tried to have sex with Julie but she was unwilling, they argued, he pushed her, and *67 she lost her balance and fell off the-railing of the bridge. When this happened, he became hysterical and blacked out, and he believed that either Robin jumped into the river to save her sister or he pushed her in. Following this alleged confession, the police arrested Mr. Cummins and announced to the- media that the Chain • of Rocks murders were solved.
Mr. Cummins later testified that after his father left the interrogation room, he was threatened by Lieutenant Jacobsmeyer that if he did not tell the police officers what they wanted to -hear, “he was going to put [Mr. Cummins] in the-hospital that night and he had witnesses that would say [Mr. Cummins] resisted arrest.". Mr. Cummins stated that -the police yelled and screamed at him and that he was told to sit on his hands, at which time one of the detectives twisted his. neck while another gave him at least ten “hard blows” in.the back of the head. Mr. Cummins stated that, despite this abuse, he did not make the statements reported by Lieutenant Ja-cobsmeyer and Detectives Pappás and Trevor.
. About the same time as Mr. Cummins was being interrogated and charged with the murders, the police received a call from a woman who, had seen a television news story about the search for the owner of a black flashlight engraved with' “Horn I.” She identified the flashlight as one that had. been stolen a few days earlier. The information she gave eventually led to the arrest of Mr. Richardson. The police apprehended Mr. Richardson on April 6 and, during an interrogation, Mr. Richardson implicated both Mr. Gray and Mr. Clemons.[7]
On the evening of April 7, 1991, St. Louis police officers located Mr. Clemons and asked if‘he would accompany them to police headquarters because his name had surfaced in “the bridge case.” Mr. Clemons agreed. At this time, Mr. Clemons was not under arrest. According to police, Mr. Clemons was advised of his rights, indicated that he understood his rights, and agreed to speak with the police. He was then interrogated for approximately 45 minutes, took a 20 break, and then was interrogated for another hour and 15 minutes by Detective Pappas and Detective Joseph Brauer.
During the first interrogation, Mr. Clemons admitted only to having been with Mr. Richardson, Mr. Gray, and a person he did not know — -later identified as Mr. Winfrey — at the Chain of Rocks Bridge on the- night of the murders but denied having any . involvement in the rapes and murders; During the second interrogation;, when Mr. Clemons was asked whether he knew Julie and Robin Kerry, he responded by asking if they “were-the two girls oh the bridge with the white dude.” ‘ According to polieé, Mr. Clemons then voluntarily' agreed to give a recorded statement. ’
During the recorded statement,- Mr. Clemons said that on the evening of April 4, he went with Mr. Richardson, Mr, Gray, and the unidentified white male to the Chain of Rocks Bridge. After they arrived, Mr. Richardson gave ,Mr. Clemons a large flashlight, -and the-group began to walk across the bridge. , During their walk, they approached two white females and one white male.and spoke with them briefly. Thereafter, Mr, Richardson came up with the idea of robbing the male and raping the two females. They all agreed to participate. Mr. Clemons admitted he *68 robbed Mrr Cummins, raped one of the girls and was on the metal platform below the bridge with the three victims and Mr. Richardson. Mr. Clemons also admitted that Mr: Richardson told him that he was going to push the sisters into the water because he did not want to leave any witnesses and that Mr. Clemons made no comment to. Mr. Richardson’s suggestion. Additionally, he stated that the Kerry sisters were stripped by Mr. Richardson and Mr. Gray, that Mr. Richardson hit one of the sisters in the face when she tried to fight him off, that the Kerry sisters were conscious and screaming during the repeated rapes and when they were pushed off the bridge, that one sister was forced to perform oral sex on Mr. Richardson, and that, after Mr. Richardson pushed one sister off, the other sister grabbed the wrist of Mr. Richardson, who then punched her and pushed her off the bridge. In Mr. Clemons’ recorded statement, he denied, however, that he pushed anyone off the pier and stated that it was Mr. Richardson who pushed the victims into the water. At the, conclusion of his statement around 1:00 to 2:00 a.m. on April 8, Mr. Clemons was arrested and booked for murder. Booking photographs were taken at this-time.[8] -
While Detectives Brauer and Pappas were interrogating Mr. Clemons, Detectives Trevor and Walsh located Mr. Gray at a friend’s house and brought him into custody.' Mr. Gray was then interrogated by Detectives Trevor, Brauer, and Pap-pas.[9] During a recorded statement by Mr. Gray, he admitted to raping both sisters but denied being in the manhole when the Sisters and Mr. Cummins were pushed off the pier. When his statement was complete, Mr. Gray was arrested and booked for murder. On April 8 at 2:10 p.m., approximately 14 hours after Mr. Clemons’ interrogation had ended, Officer Warren Williams, who was the- ex-husband of a cousin of Mr. Clemons’ mother and a police officer for the city of St. Louis, visited Mr. Clemons in a holdover cell on the request of Mr. Clemons’ mother. During the visit, Mr. Clemons told Officer Williams that he got in with the wrong people, had gotten drunk before going to the Chain of -Rocks Bridge, had raped two girls on the bridge and had left his flashlight on the bridge but that another boy had pushed the girls into the water. Officer Williams did not observe any injuries to Mr. Clemons during his visit.
Mr. Clemons’ attorney, Michael, Kelly, met with him shortly after Officer Williams had visited. Mr. Kelly observed swelling and a small abrasion to Mr. Clemons’ right check, a small abrasion on the inside of his lip, and bruises on his chest. When Mr. Clemons made his first court appearance the next day, his family also observed that there was an injury to his face. At the court hearing, Mr. Clemons’ sister, Veronda Brown, observed that the right side of his face looked lopsided and swollen. Donald Robinson, Mr. Clemons’ cousin, saw that the right side of his face was swollen and his right eye was swollen closed. ‘ Mr. Clemons’ mother, Vera Thomas, observed that the right side of his face was swollen and stuck out. His stepfather, Reynolds Thomas, also saw that thé right side oí his face was swollen and puffy. The judge who presided over that *69 court hearing ordered that Mr. Clemons be medically examined. He was taken to the emergency room at Regional Medical Center, where Dr. Stephen Duntley diagnosed Mr. Clemons with soft tissue swelling over the right sarcoma or cheek bone and tenderness at that site.
Within a short time after Mr. Clemons and Mr. Gray were arrested and booked, they both filed complaints with the police department’s Internal Affairs' Division (IAD), alleging that they had been beaten by the detectives who interrogated them. On April 9, 1991, at 3:13 p.m., two IAD investigators interviewed Mr. Clemons at the jail regarding his allegations. In the transcript of that interview, Mr. Clemons told the investigators that, on April-7, he was taken into an interview room' and that the detectives ■ started asking him questions. Mr. Clemons stated that he told the detectives that he had nothing to do with the murders on the bridge and, after being advised of his constitutional rights, stated that he wanted to talk to an attorney; Following the request, Mr. Clemons stated that a detective slapped him in the back of the head- twice, again advised, him of his constitutional rights, and threatened to bounce him off the wall if he did not talk. Mr. Clemons -again said he wanted a lawyer. Mr. Clemons said that at some point he was told to scoot back from the table and to sit, on his hands and- one of .the detectives slammed the back of,his head into the wall. When he still refused to talk, Mr. Clemons’ head was again slammed against the wall, he was choked, and he was hit in the chest by one of the detectives. He told IAD investigators that both detectives continued to strike him repeatedly until he eventually lost- consciousness.
After regaining. consciousness, Mr. Clemons agreed to make a statement to avoid more physical abuse. The officers wrote out what they wanted Mr. Clemons to say and had him read it over and over so he could remember it. The notes instructed Mr. -Clemons to declare that he was the one who pushed the women off the bridge. He refused to make that admission, and the officers told Mr. Clemons to say that he raped one of the sisters and restrained Mr. Cummins. After he made the recorded statement, Mr. .Clemons claimed that the police were unhappy with it, beat him some more, and ordered him to make a new tape. In the second tape, Mr. Clemons again confessed to the rapes and robbery, but not to the murders.
Mr. Gray’s complaint filed with the IAD alleged that his statement was coerced because he had been beaten by the police. Mr. Gray was interviewed by the IAD investigator on April 9,1991-, a little before 5:00 p.m. Mr. Gray stated that he was not advised of his rights and was told he could not have an attorney. When Mr. Gray refused to talk, he was struck by one of the police officers. He was then uncuffed and told to sit on his hands. He was then beaten in three different interrogation sessions. The detectives wrote out the statement they wanted Mr. Gray to make, and he eventually gave a tape-recorded statement confessing to robbing Mr. Cummins and. raping the Kerry sisters. He also denied pushing the Kerry sisters off the bridge.
Prior to trial, Mr. Clemons moved to suppress his statement to the police on the ground that it was involuntary because police had obtained it by beating him, in violation of his constitutional rights. The court conducted a hearing on the motion. Detectives Pappas and Brauer testified that they were present for three interrogations of Mr. Clemons and that neither of them hit Mr. Clemons or observed any injuries. Officer Williams, who visited Mr. Clemons in his holdover cell on April 8, *70 also testified for the state. He, too, stated that he did not observe any injuries to Mr. Clemons when he saw him approximately 14 hours after Mr. Clemons had been interrogated. , •
Mr. Clemons also called several witnesses, including the members of his family and his attorney who had observed his injuries on April 8 and April 9'. Additionally, Mr. Clemons testified at the suppression hearing on his own behalf, stating that Detective Pappas and another detective hit him in the head and chest while they were interrogating him. To corroborate his testimony, Mr. Clemons made an offer of proof of the transcript of Mr. Cummins’ testimony from Mr. Gray’s trial, in which Mr. Cummins said that he was beaten by the police and then was alleged to have made statements that led to his arrest for the murders of the Kerry sisters.[10] The state objected that Mr. Cummins’ statements were not relevant to whether Mr. Clemons had been beaten. After finding that the transcript of Mr. Cummins’, testimony from Mr. Gray’s trial did not show any alleged similarity in tactics employed by the police in interrogating Mr. Cum-mins and Mr. Clemons, the trial court sustained the state’s objection to the offer of proof.[11]
After hearing the evidence, the trial court overruled Mr. Clemons’ motion to suppress his confession. The court held that “the basis for [its] ruling is there was not any credible evidence to show how [Mr. Clemons] got those injuries if, in fact, he got them. And that-was other than [his] testimony.”
Mr. Clemons’ trial commenced on January 25,1993, and lasted until February 18, 1998. The state’s evidence against Mr. Clemons included Mr. Clemons’ confession, the testimony of Mr. Cummins, and the testimony of Mr. Winfrey.[12] Mr. Cummins testified consistently with his prior statements to the police. Mr. Winfrey testified that Mr. Clemons participated in the crimes by grabbing Mr. Winfrey and pushing him toward the side of the bridge until Mr.; Winfrey agreed that he would participate in the rapes; ripping the clothes off one of the Kerry sisters and getting on top of her; getting on top of the other sister; taking one of the Kerry sisters to the manhole; robbing Mr.. Cummins; throwing the girls’ clothing over the side of the bridge; putting Mr. .Cummins in the manhole; sitting on the edge of the manhole when he. sent Mr. Winfrey to find Mr. Gray; and telling Mr. Gray and Mr. Winfrey, “We threw them off. Let’s go.”
At his trial, Mr. Clemons did not testify on his own behalf, but he did present witnesses who testified they observed Mr. Clemons’ bruised face after he had been questioned by the police. In addition to his family and his attorney, Dr. Duntley, the emergency room doctor who examined him as ordered by the judge, testified for the defense that Mr. Clemons had soft tissue swelling and tenderness on his right *71 cheek bones that could have been caused by Mx\ Clemons’ cheek being hit against a solid object, such as a wall or bar..,
Before closing' arguments, the state moved to prohibit argument by defense counsel that the police beat Mr. Clemons because the only evidence presented was that he had injuries but not how they were sustained. .Because the trial court found the police denied causing the injuries and Mr. Clemons did.not disputé the officers’ testimony by presenting competent evidence as to who was responsible for inflicting the injuries, the trial court held that there was no evidentiary basis to support argument that the police coerced Mr. Clemons’ confession. Accordingly, the trial court sustained the state’s motion to prevent Mir. Clemons from arguing in his closing argument that his confession was coerced because he was beaten by police. Nevertheless, the trial court submitted a jury instruction proffered by Mr. Clemons regarding the voluntariness of his confession.[13] After deliberations, the jury found Mr. Clemons guilty of two counts of first-degree murder.
During the sentencing phase of Mr. Clemons’ trial, the' jury heard testimony from more .than 30 thirty witnesses — -13 called by the state and 18 called by Mr. Clemons. Mr; Clemons again did not testify on his own behalf. During deliberations, the jury sent a message to the judge asking for “[a]ll photographs, tape recorded' tapes (audio), statements of Winfrey, Cummins, Clemons[.]” The judge ordered that the jury deceive all photographs- admitted into evidence and the transcripts of Mr. Winfrey’s and Mr. Cummins’ statements. The jury was not allowed to hear audio recordings of Mr. Winfrey’s and Mr. Cummins’ statements because these were not played at trial. The jury was returned to the courtroom, where the court again played the recorded audio statement of Mr. Clemons' to the jury. While listening to the audio recording, the jury was allowed to review a transcript of his statement. The jury was not able to take the audio recording or the transcript of Mr. Clemons’ statement to the deliberation room.
The jury found 12 aggravating circumstances and recommended two. death sentences. Following the jury’s recommendation, the trial court sentenced Mr. Clemons to death for each of the murders.[14]
*72 On November 1, 1993, Mr. Clemons filed a motion to vacate, set aside or correct the judgment or sentence of the trial court pursuant to Rule 29.15. The trial court overruled the motion after an evidentiary-hearing. In a consolidated appeal, this Court affirmed Mr. Clemons’ convictions and sentences and affirmed the trial court’s overruling of Mr. Clemons’ motion for post-conviction relief. State v. Clemons, 946 S.W.2d 206 (Mo. banc 1997).
In his direct appeal, Mr. Clemons raised numerous claims of error, including that the trial court erred by allowing into evidence his confession because it had been obtained through physical force by police. In this Court’s opinion affirming his convictions, it determined that Mr. Clemons had not met his burden of proving that his confession was involuntary. Id. at 218. In so ruling, this Court recited the evidence in the light most favorable. to the trial, court’s ruling, particularly Officer Williams’ testimony that he did not observe an injury to Mr. Clemons during his visit. Id. The Court noted that the trial court had the opportunity to judge the credibility of the witnesses and obviously found the state’s witnesses more credible than Mr. Clemons’ witnesses. Id. The Court found that the evidence, other than Mr. Clemons’ testimony from his suppression hearing, did not demonstrate either when or how Mr. Clemons incurred any injury and that the evidence did not establish that an injury actually occurred at the hand of the police officers conducting his "interrogation. Id, The Court further found that, while there was evidence of his physical injuries, his family’s observations of his injuries occurred 48 hours or more after his interrogation and confession. Id.
After his convictions and sentences and the overruling of his post-conviction motion were affirmed, Mr. Clemons filed a writ of certiorari with the United States Supreme Court, which denied the writ without comment on November 10, 1997. He subsequently filed a petition for a writ of habeas corpus in the United'States District Court that included a claim that his confession was a product of coercion in violation of his Fifth Amendment privilege against self-incrimination. The district court denied relief on this claim but granted the petition and vacated the death penalty on other grounds.[15] Clemons v. Luebbers, 212 F.Supp.2d 1105 (E.D.Mo.2002). The state appealed, and the United States Court of Appeals for the Eighth Circuit, reversed. Clemons v. Luebbers, 381 F.3d 744, 757 (8th Cir.2004).
On June 12, 2009, Mr. Clemons filed a petition for a writ of habeas corpus in this Court pursuant to article V, section 4 of the Missouri Constitution,. asserting that newly discovered evidence established his “actual innocénce”[16] and that he' has a *73 right to have the proportionality of his death sentence reviewed, despite this' Court’s previous finding that his sentence was proportional.
As authorized by Rule 68.03, this Court appointed a special master to take evidence and issue a master’s report on the claims in the habeas petition. The master presided over discovery in the matter.[17] He heard three days of live and videotaped testimony from 23 witnesses and conducted an in-depth review of the evidence and trial record.
Before the master had conducted a formal hearing on the matter, Warren Weeks, who now lives more than 1,000 miles away from St. Louis, contacted Mr. Clemons’ counsel after learning about the special master proceeding. In response to Mr. Weeks’ expected testimony and, apparently without objection, Mr. Clemons-expanded Ms grounds for habeas relief to assert what is commonly called a “cause and prejudice” claim.[18]
At the time of Mr. Clemons’ arrest in April 1991, Mr. Weeks was a bail investigator working for the Missouri Board of Probation and Parole. In that capacity, Mr. Weeks was responsible for screening individuals soon after their arrests to see if they qualified for release. Specifically, Mr. Weeks interviewed arrestees for the purpose of obtaining information for a court commissioner’s consideration in deciding whether a prisoner should be given a pretrial release immediately or be held over until the prisoner could appear before a judge.
In a videotaped deposition presented in evidence by agreement after the three-day hearing before the master, Mr. Weeks testified that he conducted his interviews in a small room with three desks — one for Mr. Weeks, one for his- supervisor, and one for a court commissioner: A guard would bring one to four prisoners into the room. The prisoners would be seated about three feet across from the investigator’s desk and were each interviewed for 5 to 10 minutes. Mr. Weeks was responsible for interviewing prisoners and filling out a three-page pretrial release form that included information about the prisoner’s employment, ■ residence, criminal background, and mental or physical problems.
Mr. Weeks testified he was on duty on the morning of April 8, 1991, and Mr. Clemons was brought to him for his pretrial release assessment around 5:25 a.m. His interview of Mr, Clemons took place approximately three hours after Mr. Clemons was booked and more than eight hours before Mr. Williams’ visit with Mr. Clemons in the holdover cell. Mr. Weeks testified that, during this interview, he noticed a “bump” or a “bruise” on Mr. Clemons’ right cheek that he described as being between the size of a golf ball and a baseball. He asked- Mr. Clemons about the bump, but Mr. Clemons did not respond. Mr. Weeks made a record of Mr. Clemons’ injury on the pretrial release form and believes that he wrote “bump” or “bruise” on the form.
Mr. Weeks testified that after he had completed the pretrial release form, he would have given it to the court commis *74 sioner, Yvonne Edwards, to:review, and she would then record additional information on the form. Mr. Weeks testified he did not see the form again after giving it to the court commissioner for review. When Mr. Weeks viewed the pretrial release form during his deposition, he testified that his notation of a “bump” or a “bruise” had been scratched out and could not be read. He also stated that he recognized Ms. Edwards’ handwritten “okays” written throughout the form, her notations of “asthmatic — medication,” “follow up for police report, submit,” and “no bond,” and her signature on the first page of the form. Mr. Weeks testified he had not scratched out “bump” or “bruise” and did not know who had.
Mr. Weeks further testified that he discussed Mr. Clemons’ injury with his supervisor, Pete Lukanoff, after Mr. Clemons and the other prisoners left the room. Mr. Lukanoff s desk was situated right next to Mr. Weeks’ during the time Mr. Clemons was seated across the desk from Mr. Weeks. After the prisoners left the room, he commented to Mr. Lukanoff that Mr. Clemons’ injury might be from a spider bite. But, after speaking with Mr. Luka-noff who was a former St. Louis city police officer, Mr, Weeks testified he believed the injury occurred- while Mr. Clemons was being interrogated by the police.[19] Mr. Weeks testified that his interview of Mr. Clemons was otherwise unremarkable.
Mr. Weeks further testified that several months after interviewing' Mr. Clemons and filling out the form, Ben Coleman, another supervisor in the probation and parole office, called him into his office and questioned him regarding his ability to observe any injuries to Mr. Clemons. Mr. Weeks testified that he had never before been called to talk to Mr. Coleman or Mr, Lukanoff about his notations on a pretrial release form and had never heard of any of his colleagues being called to talk to the supervisors about such a matter. Mr, Coleman explained to Mr. Weeks that Neis Moss, the state’s prosecutor in Mr. Clemons’ case, wished to speak with Mr. Weeks about his evaluation of Mr. Clemons. Mr. Weeks testified that after his meeting with Mr, Coleman he felt pressured not to say anything about Mr. Clemons’ injury.
Mr. Weeks then was called to meet with Prosecutor Moss. In that meeting, Mr. Moss also challenged the accuracy of Mr. Weeks’ observations of the injury to Mr. Clemons’ face and showed him pictures of Mr. Clemons taken shortly after Mr. Clemons’ interrogation by the police that did not appear to show any injury to Mr. Clemons’ face. Mr. Weeks .testified that he had never before been called to talk to a prosecutor about an interview and had never heard of any of his colleagues being called to talk to the prosecutor.
Mr. Weeks testified he told Mr. Moss that the photos did not make him change his mind about Mr. Clemons’ injury because “[he] saw what [he] saw and everybody saw what they saw who was in that interview room.” Mr. Weeks testified that *75 Mr, Moss “made it very clear that he didn’t think that [Mr. Weeks] was describing [the injury] accurately based on the pictures.” Nevertheless, Mr. Weeks maintained that he had observed the injury to Mr. Clemons as he recorded it on the pretrial release form. Mr.-Weeks testified that Mr. Moss seemed irritated at his refusal to change his mind. Mr. Weeks was never,contacted or interviewed by internal affairs investigators.[20] Mr. Weeks’ reaction after meeting with Mr. Moss was that “there’s something weird going on. I think they don’t want to — nobody wants to talk about the — what really happened to this gentleman when he was being interviewed by the police.”
At the habeas hearing before the master, Mr. Moss was called as a witness by Mr. Clemons. Mr. Moss testified that he recalled having met with Mr. Weeks before Mr. Clemons’ trial and that -- Mr. Weeks had made some references to Mr: Clemons’ facé being swollen. When asked if a witness who had' seen Mr. Clemons’ injury immediately after'the-police interrogation would have been important to the defense, Mr. Moss - answered, “I don’t know. I would assume so.”
On August 6, 2013, the master issued his report, in which he concluded that the state had violated Mr. Clemons’ constitutional rights under Brady by suppressing material inculpatory evidence corroborating Mr. Clemons’ claim that his confession was coerced by the police. Based on his finding that Mr. Weeks’ .testimony, was credible, the master concluded that the state had deliberately concealed Mr. Weeks’ observation of Mr. Clemons’ injury and suppressed the information he recorded in the pretrial, release form by altering Mr. Weeks’ record of his observation. The master further, concluded that this ° evidence corroborated both Mr. Clemons’ claim of police abuse, made-to the IAD and his family members’ and attorney’s testimony that they had observed injuries to Mr. Clemons’ face. Moreover, the -master found that this evidence could have contradicted and impeached Officer Williams’ testimony that he did not observe any injuries to Mr. Clemons’ face. Accordingly, the master held that Mr. Weeks’ testimony may have resulted in the trial court sustaining Mr. Clemons’- motion to suppress his confession and, therefore, could reasonably have put the case in a different light so as. to undermine confidence in the verdict. On September 25, 2013, the master overruled the state’s exceptions to his report and filed an amended report with the Court.
Analysis

I. Standard of Review, for Master’s Report

In cases in which this Court appoints a master under fiule 68.03, the Court will sustain the master’s findings and conclusions “unless there is no sub *76 stantial evidence to support them, they are against the weight of the evidence, or they erroneously declare or apply the law.” State ex rel. Lyons v. Lombardi, 303 S.W.3d 523, 526 (Mo. banc 2010); see also Murphy v: Carron, 536 S.W.2d 30, 32 (Mo. banc 1976). The master’s findings should receive the “weight and deference which would be given to a court-tried case by a reviewing court” due to “the master’s unique ability to view and judge the credibility Of witnesses.” State ex rel. Woodworth v. Denney, 396 S.W.3d 330, 336-37 (Mo. banc 2013) (internal quotations omitted). In light of this deference, “[t]his Court should exercise the power to set aside the findings and conclusions [of the master] on the ground that they are against the weight of the evidence with caution and with a firm.' belief that the conclusions are wrong.” Id. at 337.

II. Standard of Review for Habeas Relief

Habeas corpus relief is the final judicial inquiry into the validity of a criminal conviction and functions to relieve defendants whose convictions violate fundamental fairness. Id. A habeas petitioner has the burden of showing that the petitioner is entitled to habeas corpus relief. State ex. rel. Winfield v. Roper, 292 S.W.3d 909, 910 (Mo. banc 2009). “[A] writ-of habeas corpus may be issued when a person is restrained of his or her liberty in violation of the constitution or laws of the state or federal government.” Woodworth, 396 S.W.3d at 337 (internal quotations omitted).
The available relief under a writ of habeas corpus is limited :and generally cannot be utilized to raise procedürally barred claims, such as those that could be raised on. direct appeal or in a post-conviction proceeding. Id. Habeas corpus can provide relief even for procedürally barred claims if the petitioner can show:
(1) a claim of actual innocence or (2) a jurisdictional defect or (3)(a) that the procedural defect was caused by something external to the defense — that is, a cause for which the defense is not responsible — and (b) prejudice resulted from the underlying error that worked to the petitioner’s actual and substantial disadvantage.
State ex rel. Zinna v. Steele, 301 S.W.3d 510, 516-17 (Mo. banc 2010). Moreover, a petitioner may seek habeas , relief for procedurally barred claims “in circumstances so rare and exceptional that a manifest injustice results.” State ex rel. Simmons v. White, 866 S.W.2d 443, 446 (Mo. banc 1993); see also State ex rel. Engel v. Dormire, 304 S.W.3d 120, 125 (Mo. banc 2010).
Mr. Clemons seeks to overcome the procedural bar to his habeas corpus claim by showing “cause and prejudice.” “To demonstrate cause, the petitioner must show that-an effort to comply with the State’s procedural rules was hindered by some objective factor external to the defense.” Woodworth, 396 S.W.3d at 337. The factual or legal basis for a claim must not have been reasonably available to counsel or some interference by officials must have made compliance impracticable. Id Evidence that has been deliberately concealed by the state is not reasonably available to counsel and. constitutes cause for raising otherwise procedürally barred claims in a petition for a writ of habeas corpus: Amadeo v. Zant, 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Here, Mr. Clemons argues that he is entitled to a writ of habeas corpus because the state deliberately concealed Mr. Weeks’ observation of an injury to Mr. Clemons’ face and suppressed the information he recorded in the pretrial release form by-altering Mr. Weeks’ record of his *77 observation (collectively, “the Weeks evidence”).
Even though the master did not separately analyze whether Mr. Clemons established “cause” sufficient to overeóme the procedural bar to his habeas claims, the master’s findings and con'clusions support the conclusion that Mr. Clemons has established sufficient .cause. The master found that there was “no indication that the State ever informed the defense about what Weeks observed,” This finding is consistent with the fact that the description of Mr. Weeks’ report in Mr. Clemons’ IAD report is misleading in that the description does not include Mr. Weeks’ notation of a “bump” or “bruise” and, instead, notes that Mr. Weeks indicated that Mr. Clemons’ only health problem was asthma. Additionally, while the state endorsed Mr. Weeks as a witness in a memorandum sent to Mr. Clemons’ counsel on September 16, 1992, the state did not include the information that Mr. Weeks had observed that Mr. Clemons was injured. Although Mr. Clemons knew of his own injuries and that Mr. Weeks inquired about an injury, Mr. Weeks did not tell Mr. Clemons that he was recording Mr. Clemons’ injury in his pretrial releáse report, so Mr. Clemons could not have known that this material existed.
Additionally, although the state produced the pretrial release form, Mr. Weeks’ recórd of Mr. Clemons’ injury was scratched out. The master found Mr. Weeks’ testimony that he .had recorded his observations on the pre-release form credible and that, although it was not known who had scratched out the notation, “it had to be someone who [did] it on behalf of the State.” The.master concluded that the state had deliberately concealed the Weeks evidence.
The existence of a written record created by an employee of the board of probation and parole noting a significant injury to Mr. Clemons’ face less than three hours after he was booked that was altered after the lead prosecutor for the state had knowledge of the reports content and attempted to get the author of the report to change his statements is substantial evidence in support of the master’s conclusion that the state deliberately concealed the Weeks evidence and that this evidence was not, therefore, reasonably available to defense counsel due to an objective factor external to the defense. Accordingly, Mr. Clemons has established the cause needed to overcome the procedural bar to review of his habeas claim by showing that this evidence was not reasonably available to counsel because of a reason external to the defense. '
Under the “cause and prejudice” standard, however, Mr. Clemons must also show “that he is entitled to habeas review because this Court’s failure to review his claims would prejudice him.” Engel, 304 S.W.3d at 126. The determination of whether prejudice resulted from the.underlying error under a cause and prejudice standard is identical to this Court’s assessment of prejudice in evaluating Mr. Clemons’ Brady claims. Id. If Mr. Clemons “establishes the prejudice necessary, to support his Brady claims, he will have shown the required prejudice to overeome the procedural bar for habeas relief.” Id. Accordingly, this Court turns to Mr. Clemons’ claims of the state’s Brady violations.
III. Brady Violation Analysis
In his claim, Mr. Clemons asserts that the state willfully violated Brady by failing to disclose the Weeks evidence to the defense. Brady holds that “the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *78 irrespective of the good faith or bad faith of the prosecution.” Brady, 373 U.S. at 87, 83 S.Ct. 1194. Brady was extended to hold that prosecutors have a duty to disclose Brady material that is not conditioned on a defendant’s request for such material. Banks v. Dretke, 540 U.S. 668, 696, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004) (“A rule thus declaring ‘prosecutor may hide, defendant must seek,’ is not tenable in a system constitutionally bound to accord defendants due process.”). To prevail on his Brady.claim, Mr. Clemons must show that: (1) the evidence at issue is favorable to him either because it is exculpatory or impeaching; (2) the evidence was, either willfully or inadvertently, suppressed by the state; and (3) he suffered prejudice as a result of the state’s suppression. Woodworth, 396 S.W.3d at 338 (citing Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
In determining the materiality of the evidence to guilt or punishment and, therefore, prejudice, it is not required that the disclosure of the suppressed evidence would have ultimately resulted in the defendant’s acquittal. Woodworth, 396 S.W.3d at 338; Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). A defendant is prejudiced by the suppressed evidence if the “favorable evidence is material” and “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Kyles, 514 U.S. at 433, 115 S.Ct. 1555 (internal quotations omitted). According to the United States Supreme Court:
The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the government’s evidentiary suppression undermines confidence in the outcome of the trial.
Kyles, 514 U.S. at 434, 115 S.Ct. 1555 (internal quotations omitted); see also Woodworth, 396 S.W.3d at 338.

A. The Warren Weeks Evidence

In seeking habeas relief; Mr. Clemons asserts that the state violated his due process rights pursuant to Brady when it failed to disclose to the defense Mr. Weeks’ observations of the injury to Mr. Clemons’ face and the pretrial release form he prepared stating that Mr. Clemons had a “bump” or “bruise” on his face. Though Mr. Weeks was endorsed as a witness by the state in a memorandum sent to Mr. Clemons’ counsel on September. 16, 1992, the state failed to include any information regarding Mr. Weeks’ observation of Mr. Clemons’ injury or his record of the injury on the pretrial release form. For Mr. Clemons to prevail on his Brady claim, he is required to show that the Weeks evidence was favorable to his defense; that it was suppressed by the state; and that its suppression was prejudicial. Woodworth, 396 S.W.3d at 338 (citing Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936).

B. Evidence Favorable to the Defense

The first Brady prong is whether the evidence of Mr. Weeks’ observation of an injury to Mr. Clemons’ face and his report documenting that observation was favorable to the defense either because it is exculpatory or impeaching. Evidence is exculpatory if it is “material either to guilt or to punishment[.]” Brady, 373 U.S. at 87, 83 S.Ct. 1194. Impeachment evidence is evidence that “affect[s] [the] credibility” of a wit *79 ness. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). It is favorable to the accused-“[w]hen the reliability of a given witness may well be determinative of guilt or innocence.” Id. (internal quotations omitted). To be favorable, the evidence should “ha[ve] some weight” with a “tendency” to be favorable, Kyles, 514 U.S. at 451, 115 S.Ct. 1555. The master determined that Mr. Clemons had presented substantial evidence that the Weeks evidence was favorable to the defense. In reaching this conclusion, the, master found especially significant this Court’s findings in its review of Mr. Clemons’ conviction and sentence in his direct appeal and the overruling of his motion for post-conviction relief..
During Mr. Clemons’ suppression proceedings, he claimed that the police used physical force to coerce his confession, but his evidence supporting his claims was only the testimony of his family members and attorney and was without the benefit of testimony from an unrelated witness who was employed by the state. Clemons, 946 S.W.2d at 213. This Court, in rejecting Mr. Clemons’' assertion, emphasized the significance of the evidence presented and the testimony heard at-the hearing on Mr. Clemons’ motion to suppress his confession. <Id. Specifically, this Court found that Mr. Clemons’ witnesses could “not demonstrate either when or how [he] ‘incurred any injury”- because of: (1) the delayed timing of the witnesses’ observations of 'Mr. Clemons’ injury and (2) the credibility of the witnesses testifying on Mr. Clemons’ behalf. Id.
First; this Court found the fact that the majority of witnesses testifying that they had observed injuries to Mr. Clemons’ face following his interrogation by the police had seen Mr. Clemons “some 48 hours or more” after the interrogation, making it difficult to establish when or how the injury occurred. Id. The only testimony in Mr. Clemons’ favor based on an earlier observation came from his former attorney, Michael Kelly, who had seen Mr. Clemons approximately 14 hours after Mr. Clemons’ interrogation had ended. Id. Mr. Kelly stated that he had observed injuries to the right side of Mr. Clemons’ face at that time. Id. The Court concluded, however, that Mr. Kelly’s testimony was impeached by the testimony of Officer Williams, who had- seen Mr. Clemons shortly before Mr. Kelly and who testified that he did not observe any sign of injury. Id. Second, though Mr. Clemons’• family offered corroborating testimony of his injury, this Court noted that “[t]he trial court had the opportunity to judge the credibility of the witnesses and obviously found the state’s witnesses’ testimony moré credible than [Mr. Clemons’].” Id.
Based on this Court’s' reliance on the witnesses’ testimony and its emphasis on the timing and credibility of those witnesses’ observations of Mr. Clemons, the master determined that “the testimony by [Mr. Weeks] that he saw Mr. Clemons less than three hours after he was booked, and more than eight hours before Williams, could serve to contradict Williams” and impeach Mr. Williams’ credibility. The master reached this conclusion especially “in light of the fact that — unlike the other defense witnesses who testified for Clemons on this issue — Weeks had no ties to demons.” The master noted that Mr. Weeks’ testimony would have lent substantial credibility to Mr. Clemons’ claim that his confession was coerced because Mr. Weeks was a witness not related to Mr. Clemons and was without apparent cause to fabricate his observations. This is significant.
Much has been made of the fact that Mr. Williams was the ex-husband of a cousin of *80 Mr. Clemons’ mother. Little has been made of the fact that Mr: Williams was-employed by the city of St. Louis as a police officer. In contrast, Mr. Weeks was employed by the state as a bond investigator for the board of probation and parole, so he was the only witness regarding 'Mr. Clemons’ injury who did not have a potential'bias either in favor of Mr. Clemons or in favor of the St. Louis police. Mr. Weeks’ testimony was not, therefore, merely cumulative of the testimony.of Mr. Clemons’ family members and attorney. Evidence is not cumulative “when it goes to the very root of the matter in controversy or relates to the main issue, the decision of which turns on the weight of the evidence.” Black v. State, 151 S.W.3d 49, 56 (Mo. banc 2004) (internal quotations omitted). Mr. Weeks’ testimony offered, an independent corroboration of Mr. Clemons’ allegation that the police beat him in which-the credibility of this allegation turned exclusively on the weight of the evidence presented. See id; see also State v. Perry, 879 S.W.2d 609, 613 (Mo.App.1994).
In light of the deference given to the master’s credibility findings, there is substantial evidence to support the master’s conclusion that the undisclosed evidence from an objective, impartial witn’ess corroborating Mr. Clemons’ testimony was favorable to Mr. Clemons. Mr. Weeks’ testimony would have provided the most immediate account of Mr. Clemons’ physical appearance following his interrogation. The evidentiary value of the most immediate account of Mr. Clemons’ appearance was made evident on direct appeal when this Court ultimately concluded that because Mr. Williams’ observation of Mr. Clemons took place before Mr. Kelly’s, Mr. Williams impeached Mr. Kelly. The credibility of the state’s witnesses is further discredited by. the evidence of the misleading description of Mr. Weeks’ pretrial release report in the IAD report, the conduct of Mr. Weeks’ supervisor and the prosecutor in attempting to convince Mr. Weeks to change his report, and the subsequent alteration of Mr. Weeks’ report. Again, the courts must “consider the effect of all of the suppressed evidence along with the totality of the other evidence uncovered following the prior trial.” Woodworth, 396 S.W.3d at 345. This evidence, considered in the totality of the circumstances,-supports the master’s conclusion that Mr. Weeks’ observations of Mr. Clemons’ injury, which occurred more than eight hours before Mr. Williams’ observations, and his report would be favorable to corroborate Mr. Clemons’ testimony and impeach Mr. Williams’ testimony. Additionally, this evidence may have led the trial court to sustain Mr. Clemons’ motion to suppress his confession.
Mr. Clemons’ confession included the only direct evidence that he was on the platform below the'bridge when the sisters were pushed into the water,- as well as evidence that-the rapes were planned, the Kerry sisters were repeatedly struck on the face during the rapes, Mr. Richard-, son forced one of the sisters to perform oral sex, and both sisters were conscious and aware of what was happening, all of which likely would have influenced the jury’s decision in sentencing Mr., Clemons to death. Though the state presented circumstantial evidence that Clemons was on the platform,[21] “[a] confession is like no *81 other evidence” because it “is probably the most probative and damaging evidence that can be admitted against [a defendant].” Arizona v. Fulminante, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (internal quotations omitted). Moreover, a defendant is prejudiced by a coerced confession admitted into evidence “[p]recisely because' confessions of guilt, whether coerced or freely given, may be truthful and potent evidence[.]” Lego v. Twomey, 404 U.S. 477, 483, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). In admitting a coerced confession into evidence, a defendant is “compelled to condemn himself by his own utterances” in violation of his constitutional right to due process of law, Id. at 485, 92 S.Ct. 619.
Certainly, evidence that may have resulted in the trial court- suppressing Mr. Clemons’ damaging confession is evidence favorable to Mr. Clemons because it may have made “the difference between conviction and acquittal,” United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), or a death sentence and a sentence of life without parole. Contrary to the argument in the dissent, the Weeks evidence need not be sufficient to produce this result but need only be such that if used effectively “would have had some weight and its tendency would have been favorable” to Mr. Clemons. Kyles, 514 U.S. at 451, 115 S.Ct. 1555.
Additionally, even if the trial court were to continue to deny Mr. Clemons’ motion to suppress, the Weeks evidence would be favorable to the defense at trial because it may have led the trial court to overrule the state’s motion in limine to prohibit argument in closing by defense counsel that the police beat Mr. Clemons to coerce his confession. Before closing argument, Mr. Clemons stated he intended to argue “that Clemons’ face was swollen after the interrogation, and he was seen by a number of people, and .... Cummins said he got hit.” The state objected, arguing that because the officers denied hitting Mr. Clemons and because Mr. Clemons did not take the stand to refute the officers, there was no reasonable inference that the police beat Mr. Clemons during the interrogation. The court agreed, stating “there’s no evidence that the police [beat Mr. Clemons]” because “he could have been hurt anywhere along the line.”
But, if Mr. Clemons had called Mr. Weeks to testify at trial-.regarding his observations and record of Mr. Clemons’ injury on the pretrial release, form and the efforts of the supervisor and the prosecutors to convince Mr, Weeks to change his report, the Weeks evidence would have been significant to the court in its ruling. The Weeks evidence included Mr. Weeks’ observations and record of Mr. Clemons’ injury; Mr. Weeks’ testimony that, after a conversation - with his boss, Mr. Lukanoff, Mr. Weeks believed the police- Caused Mr. Clemons’ injury; his conversations with his supervisor and the prosecutor during which they attempted to convince him to change his report; the alteration of the report by the state; and the failure of the IAD report to accurately describe Mr. *82 Weeks’ pretrial release report or include Mr. Lukanoff as a witness to Mr. Clemons’ condition at the time of the pretrial release interview. Together' this- evidence'; supports a reasonable inference , that Mr. Clemons was beaten by,the police during his interrogation.
Mr. Weeks’ testimony also would have independently supported Mr." Clemons’ claim that his confession was not voluntary because it was physically coerced. This is significant given that jury instruction 27 instructed the jury to disrégard and “give no weight in- your deliberation” to the statement if they did not believe'it was freely and voluntarily made.
The master’s conclusion that the suppressed evidence would liave been favorable to Mr. Clemons is supported by substantial evidence, and this Court adopts the master’s findings as to first prong of Brady.
C. Failure to Produce Brady Material
The second Brady prong is whether the state failed to produce the favorable Weeks evidence to the defense. Although it does not matter whether the failure was willful or inadvertent, Brady, 373 U.S. at 87, 83 S.Ct. 1194, after completing his exhaustive review of the evidence and trial record and after assessing the credibility of witnesses at the September 2012-hear-ing, the master found that the state deliberately failed to produce the favorable Weeks evidence to Mr. Clemons.
The master “believed Weeks when he testified that he recorded his observations of Clemons, on the Pretrial Release Form.” The master concluded that .the pretrial release form completed by Mr. Weeks had been altered and,- while it was uncertain exactly who had crossed out the' description of Mr. Clemons’ injury, “it'had to be someone who had [done] it on behalf of the state.” The master found that there was no indication that the state ever informed the defense of Mr. Weeks’ recorded observations or of his oral statements of those observations, noting at the very least, even in the .absence of the pretrial release form, Mr. Clemons could have called Mr. Weeks as a witness at trial to provide oral testimony of his observations of Mr. Clemons’ injury. Based on these determinations, the master concluded that Mr. Clemons has, indeed, satisfied the second element of Brady by proving that the state suppressed the Weeks evidence from the defense. ■
Due to the master’s unique ability to view and judge the credibility of witnesses, this Court will uphold the master’s findings and conclusions so long as they are supported by substantial evidence. In light of the master’s credibility determination, this Court’s deference , to that determination, and the evidence showing that the state intentionally took steps to hide Mr.. Weeks’ corroborative testimony from Mr. Clemons by attempting to convince Mr. Weeks to change his report to prevent further reporting of Mr. Clemons’ injury; altering his- record of the injury on the pretrial release form; and failing to disclose the Weeks evidence to Mr. Clemons, this Court adopts the master’s findings and conclusions that Mr. Clemons satisfied the second prong of Brady.

D. Prejudice from non-disclosure

In the third and final prong of Brady, Mr. Clemons must prove that his defense was prejudiced by the state’s failure to disclose the Weeks evidence. In determining prejudice, as noted, Mr. Clemons does not have to demonstrate that the state’s disclosure of the evidence would have ultimately resulted in Mr. Clemons’ acquittal. Woodworth, 396 S.W.3d at 338. “[A] showing of materiality does not require demonstration by a pre *83 ponderance that disclosure of the suppressed evidence would have resulted ultimately in the. defendant’s acquittal[.]” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Rather, it is enough if the défendant shows “a ‘reasonable probability’ of a different result[.]” Woodworth, 396 S.W.3d at 338 (quoting Kyles, 514 U.S. at 434, 115 S.Ct; 1555).
A “reasonable probability” of a different result is shown when the government’s evidentiary suppression “undermines confidence in the outcome of the trial.” Bagley, 473 U.S. at 678, 105 S.Ct. 3375. In Kyles, the Supreme Court found that “[t]he question is not whether' the defendant would more likely than not have received & different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” 514 U.S. at 434, 115 S.Ct. 1555 (emphasis added). Importantly, this Court must analyze “the possibility that such effect might have occurred ⅛ light of the totality of the circumstances and with an awareness of the difficulty of reconstructing in a posttrial proceeding the course that the defense and the trial would have taken had the defense not been misled by the prosecutor’s incomplete response.” Bagley, 473 U.S. at 683; 105 S.Ct. 3375.
In his review, the master determined that Mr. Clemons satisfied the prejudice prong of Brady. In so finding, the master once again noted this Court’s prior ruling affirming the trial court’s denial of Mr. Clemons’ nation to suppress his confession on the basis of Officer Williams’ testimony at the hearing on the motion to suppress. See Clemons, 946 S.W.2d at 218. Mr. Weeks’ interview with Mr. Clemons took place only three hours after he was booked, significantly closer to the time of the police interrogation than the visit.by Officer Williams, in which.no injuries were purportedly-observed. •
Here, the fact that the trial court denied Mr. Clemons’ claim in his motion to suppress that his confession was physically coerced and allowed into evidence Mr. Clemons’ confession without having the benefit of Mr, Weeks’ testimony substantially supports, the master’s finding that Mr. Clemons was not given a “fair trial.” This is particularly true in light of the fact the trial court’s primary basis for not suppressing Mr. Clemons’ confession was because Mr. Clemons could not. prove .at whose hands and when he suffered his injury. As noted by the trial court at the hearing ’on the motion’ to suppress, it believed “he could have been hurt anywhere along the line.”
Additionally, Mr. Weeks’ observations were consistent with and corroborate the testimony of Mr. Clemons, his family members, his attorney, and the’.hospital records as to the cause, timing and extent of Mr. Clemons’ injury. This testimony would, have provided the court with the most, immediate account of Mr. Clemons’ appearance — nearly eight hours before Officer Williams, and long before, any of the other defense witnesses who observed injuries to Mr. Clemons — serving to both undermine' the theory that Mr. Clemons self-inflicted his injuries and serving to impeach the testimony of Officer Williams that he observed no injuries. Accordingly, the proximity of Mr. Weeks’ interview to Mr. Clemons’ police interrogation as compared with Officer' Williams’ visit impeaches the testimony of Officer Williams. This impeaching and credible testimony, concluded the master, may have led the trial court to' sustain Mr. Clemóns’ motion *84 to suppress.[22]
The master’s conclusion that Mr. Clemons’ confession may well have been suppressed if the Weeks evidence had been available at the suppression hearing is well founded as there is convincing evidence that Mr. Clemons was beaten to confess. When a defendant challenges the admissibility of a confession due to allegations of physical coercion, the state has a burden to show by a preponderance of the evidence that the confession was voluntary. State v. Johnson, 207 S.W.3d 24, 45 (Mo. banc 2006). The United States Supreme Court states:
The test for voluntariness is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny, or to refuse to answer and whether physical or psychological coercion was of such a degree that the defendant’s will was overborne at the time he confessed.
Id. (internal quotations omitted).
It is known that Mr. Cummins, the victim, made strikingly similar allegations of restraint during the abuse by the police, as did Mr. Gray. All three men reported they were instructed to sit on their hands before being struck by the police officer, a unique tactic of restraint by the police. Mr. Clemons and Mr. Gray reported this unique method of restraint to the LAD investigators within two days of their interrogations. While it might be possible that Mr. Clemons and Mr. Gray colluded to create stories with the same unique manner of restraint, there is no likelihood that they colluded with Mr. Cummins. And it would strain credulity to suggest that it is a coincidence that Mr. Cummins testified to the same unique manner of restraint during his interrogation.
Like Mr. Clemons, Mr. Gray subsequently confessed after alleging he was physically abused. Mr. Cummins’ and Mr. Gray’s allegations of unique circumstances diming the physical abuse, plus Mr. Weeks’ testimony that both impeaches Officer Williams and lends substantial credibility to Mr.. Clemons’ testimony, is credible evidence that Mr. Clemons’ will was overborne at the time of his confession and that his confession should have been suppressed. The evidence supports the master’s conclusion that there was a reasonable probability of a different result at Mr. Clemons’ trial if the jury had never heard Mr. Clemons’ confession.
As discussed above, a defendant’s confession is highly probative evidence. State v. Seibert, 93 S.W.3d 700, 709 (Mo. banc 2002) (Benton, J. dissenting). A jury may be unable “to ignore the probative value of a truthful but coerced confession” and may, therefore, be unduly “influenced by the reliability of a confession it considered an accurate account of the facts” when *85 judging the voluntariness of the confession. Lego, 404 U.S. at 483, 92 S.Ct. 619. Mr. Clemons’ confession, introduced at trial and presented again to the jury in written and audio form during their sentencing deliberations, provided the jury with the only direct evidence that he was on the platform below the bridge at the time the Kerry sisters were pushed to their death. Neither Mr. Cummins nor Mr. Winfrey stated that Mr, Clemons was on the platform with Mr. Richardson when the Kerry sisters were pushed. Though other circumstantial evidence was presented, Mr. Clemons’ confession was “the most probative and damaging evidence that [could] be admitted” against him. Fulminante, 499 U.S. at 296, 111 S.Ct. 1246. In addition to Mr. Clemons’ confession being the only direct evidence placing Mr. Clemons on the platform, the confession also provided disturbing details of Mr. Clemons’ rape of the Kerry sisters, which likely would have influenced the jury’s decision in sentencing Mr. Clemons to death.
The master .expressly stated that he believed that Mr. Clemons satisfied the Brady materiality standard such that “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Notably, the master does not limit his conclusion to the .result of the suppression hearing but correctly extends his lack of confidence to the whole case, including the guilt and sentencing phase.
Accordingly, Mr. Clemons was denied a fair trial not only because the state’s suppression of the Weeks evidence prejudiced Mr. Clemons at the hearing on the motion to suppress his .confession but also because the jury was not able to hear Mr, Weeks’ testimony in determining whether his confession was voluntary. In this regard, even if the trial court did not suppress Mr. Clemons’ confession, it is reasonably probable that the Weeks evidence would have led the trial court to rule against the state’s motion in limine -and allow defense counsel to argue during closing arguments that Mr. Clemons’ confession was coerced. The trial court’s rationale for prohibiting this argument was that there was no evidence at trial that Mr. Clemons’ had been beaten to confess. Mr. Weeks’ credible testimony would have provided evidence to support the reasonable inference that he was beaten.
Moreover, the jury would have been able to consider Mr. Weeks’ testimony while deliberating on whether Mr. Clemons’ confession was freely and voluntarily made as required by jury instruction 27. With both Mr. Clemons’ closing argument that he was beaten and the Weeks evidence before the jury, it is reasonably probable that the jury would have found Mr. Clemons’ statement was coerced. Had the jury found Mr. Clemons’ statement was coerced, as required by jury instruction 27, it would have had to disregard it and give it no weight during deliberations because the confession was not freely and voluntarily made.
The state attempts to refute the master’s conclusion that Mr. Clemons was prejudiced by the state’s suppression of the Weeks evidence by first arguing that even if Mr. Clemons’ confession would have been suppressed, harmless error would protect the verdict because of the weight of evidence presented at trial establishing Mr. Clemons’ guilt. The state’s argument, however, is meritless in light of the United States Supreme Court’s holding in Kyles that once a Brady violation has been found, “there is no need for further, harmless-error review.” Kyles, 514 U.S. at 434, 115 S.Ct. 1555. Such an error cannot “be treated as harmless, since [there is] a reasonable probability that, *86 had the evidence been disclosed to the defense, the result of the proceeding would have been different,” which “necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury’s verdict.” Id. at 435, 115 S.Ct. 1555 (internal quotations omitted). Accordingly, harmless-error analysis cannot.be used to protect the trial court’s verdict.
The state also attempts to refute the master’s finding of prejudice by alleging Mr. Clemons misapplies the law by expanding the application of the Strickland v. Washington standard, of prejudice to the outcome of rulings on motions, 466 U.S. 668, 695, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). According to the state, Strickland is limited to the outcome of the trial and the master improperly extends it to include the outcome of Mr. Clemons’ hearing on his motion to suppress. Neither the United States Supreme Court nor this Court have'previously stated whether Brady applies to suppression hearings.[23] Here, however, it is not necessary to determine whether Brady would apply to all suppression" hearings. The Weeks evidence would have been admissible at trial, not just at the suppression hearing, so the application of Brady, here, is not limited to the suppression hearing. In- this circumstance, the analysis of prejudice -and whether there is “a ‘reasonable probability of a different, result” due to the state’s Brady violation extends to the evaluation of the outcome of both the suppression hearing and the trial.
In a similar argument, the state asserts the master failed to properly apply Strickland. The state contends that the master did not apply the “reasonable probability” standard of prejudice articulated in Strickland but rather some lesser standard as indicated in his statement that the Weeks evidence “may have resulted in the trial court sustaining the motion to suppress.” After careful review of the entirety of the master’s' legal analysis, this Court finds that the master’s findings and conclusions do not erroneously declare or apply the law. In its argument, the state ignores the master's initial analysis of the prejudice prong where he articulates the correct legal standard, noting that “Clemons does not have to demonstrate that disclosure of Weeks’ knowledge of injury and the obscured form would have resulted ultimately in [Clemons’] acquittal.” (Internal citations omitted). Instead, the master correctly observed that, “it is enough if there is a reasonable probability of a different result,”- (emphasis added) and “[t]his element is satisfied ‘when the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine the confidence of the verdict.’” (Internal citations omitted). In the very next sentence of his report, the *87 master plainly states his finding on the issue: “I believe Clemons has satisfied that standard.” Accordingly, it is clear that the master indeed understood and applied the “reasonable probability” standard as articulated in Strickland, to find that Mr. Clemons has satisfied the prejudice prong of Brady.
As previously stated, this Court gives, deference to the master’s finding, of prejudice because of the master’s unique ability to view and judge the credibility of witnesses. Woodworth 396 S.W.3d at 336-37. This Court will only set aside the master’s findings if they are against the weight of the evidence and, even then, will only do so “with caution and with a firm belief that the conclusions are wrong.” Id. at 337. In other words, this Court will sustain the master’s findings “unless there is no substantial evidence to support them.” Id.
As detailed above, substantial evidence exists to support the master’s findings and conclusion that Mr. Clemons was prejudiced because of the state’s suppression of the notation of “bruise” or “bump” in Mr. Weeks’ pre-release, report and his observations of Mr. Clemons’ injury. The record includes substantial, credible evidence that Mr. Clemons’ confession was coereed by physical abuse inflicted by the police that would require that his confession be suppressed. As such, this Court accepts that Mr. Clemons has demonstrated that the state’s suppression of the favorable evidence of Mr. Weeks’ observations and’ recordings was prejudicial. Considering the effect that the Weeks evidence may have during the suppression healing and at trial, along with the effect Mr. Clemons’ confession likely had during both the guilt and the penalty phase of his trial, there is a reasonable probability of a different result either , in Mr. Clemons’ conviction or sentence. Therefore, Mr. Clemons was prejudiced and did not receive a fair trial with a verdict worthy of confidence.[24] Additionally, because Mr. Clemons has established the prejudice necessary to support his Brady claim, he has also shown the required prejudice to overcome the procedural bar for habeas relief. See Engel, 304 S.W.3d at 126.
Overall, the master found that Mr. Clemons met all three elements of his Brady claim by showing that the Weeks evidence was materially favorable evidence; that it was either willfully or inadvertently suppressed by the state; and that its suppression was prejudicial. In making this determination, the master reviewed thousands of pages of record, heard multiple days of testimony during which he could evaluate the credibility of the witnesses, and, ultimately, submitted his findings to this ■ Court in an official report. After a thorough analysis of the evidence and legal ‘analysis used by the master, this Court finds the master’s findings and conclusions are supported by substantial evidence, are not against the weight of the evidence, and correctly declare and apply the law. This Court accepts the master’s conclusions with a firm belief that they are correct and holds that Mr. Clemons has successfully proven the right to a new trial due to the state’s violation of the principles of due process and the standards of justice, as outlined in Brady.

IV Proportionality Review

In his second claim for habeas relief, Mr. Clemons asserts that his death sen- *88 tenee is disproportional due to his age'and lack of criminal record, new evidence that his confession was coerced, evidence that he did not directly murder the Kerry sis-' ters but only acted as an accomplice, and the reduced sentence of his “more culpable” codefendaht, Mr. Richardson. Because this Court reverses Mr. Clemons’ convictions and sentences for the state’s violation of his due process right's as recognized in Brady, Mr. Clemons’ proportionality claim will not be addressed.
Conclusion
After days of hearings and an extensive review of the case, the master concluded that the state deliberately failed to disclose evidence favorable to the defense. The. testimony from Mr. Weeks, an employee of the board of probation and parole, regarding injuries to Mr. Clemons’ face within a short time after being' interrogated by police was independent evidence that he was beaten and coerced to give an audiotaped confession that included incriminating evidence, particularly that he admitted being on the platform under the bridge when Julie and Robin Kerry were pushed- to their deaths. Additional evidence of improper conduct by officials handling Mr. Clemons’ case was Mr. Weeks’ testimony that one of his supervisors and the lead prosecutor in the case attempted to convince him to change his written report of the injury and, despite his refusal, the report was altered to redact any reference to the injury.
The master also determined that the state’s failure to disclose this evidence prejudiced Mr. Clemons. The master found that the testimony of Mr. Weeks, who interviewed Mr. Clemons less than three hours after he was booked, would have served to contradict and impeach the testimony of the state’s witness,. Officer Williams, who testified that he .-did not observe injuries to Mr. Clemons-more than 12 hours after the interrogation;
The Weeks evidence would also have been significant to the court in its ruling to prohibit defense counsel from arguing during closing’ arguments that police beat Mr. Clemons to confess, as would the evidence that Mr. Cummins had similarly testified that police physically abused him to confess. Additionally, the credibility of the police officers’ testimony that they did not beat Mr. Clemons and coerce his confession is further impeached by evidence that the manner in which Mr. Clemons claimed he was beaten included the unique command to sit on his hands, which was identical to a command given to the victim, Mr. Cummins, when he was beaten by the police in an attempt to get him to confess. Finally, there is evidence that police officers investigating the murders falsified a report to state that Mr. Cummins had admitted that he had sexual desires for Julie, that he had tried to have séx with' Julie the night of the murders and when she refused had pushed her, causing her to lose her balance and fall off the bridge, and that he had run off the bridge.
The master concluded that the suppressed Weeks evidence, along with the totality of other evidence showed cause and prejudice, sufficient to undermine confidence in the outcome of the trial, resulting in a Brady violation by the state. This determination is supported by substantial, evidence and does not erroneously declare or apply the law. This Court, therefore,, adopts the master’s recommendation, and vacates Mr. Clemons’ convictions and sentences for first-degree murdér.. Within 60 days from the date the mandate issues in this case the state may file an election in the circuit court to retry him. If the state so elects, the new trial shall be held expeditiously. If the state does not §o elect, the case against Mr. Clemons shall -be *89 dismissed and Mr. Clemons shall be discharged on this matter.
, Stith and Teitelman, JJ., and Hardwick, Sp. J., concur; Wilson, J., dissents in • separate opinion filed; Fischer and Russell, JJ., concur in opinion of Wilson, J. Draper, J., not participating.

. On June 19, 2007, Mr. Clemons received a 15-year sentence for committing violence to a department of corrections employee to be served consecutively to his death sentence. Clemons v. Steele, No. 4:11CV379 JCH, 2011 WL 5912617, at *1 (E.D.Mo. Nov. 8, 2011). As such, Mr, Clemons shall remain in*-the state’s custody.

. Portions of this opinion are taken without attribution from the Court’s opinion in State v. Clemons, 946 S.W.2d 206 (Mo. banc 1997), and the amended final report of the special master.

. Because the two sisters share _the same surname, they will be referred to by their first names for clarity, No disrespect is intended.

. The Chain of Rocks Bridge is a former highway bridge that spans the width of the Mississippi River, connecting Missouri to Illinois. At the time of the crimes, it was abandoned.-

. Three days later, on April 8, 1991, the watch stolen from Mr. Cummins was found hidden in a residence where Mr. Gray had recently visited. On this discovery, Mr. Cummins returned from Maryland to Missouri to view a series of lineups. From the lineups, Mr. Cummins was able to identify Mr. Clemons, Mr. Gray, Mr. Richardson, and Mr. Winfrey as his assailants.

. Mr. Cummins .stated that he saw a ‘‘black’' arm push Julie off the bridge and that the same or another black arm pushed Robin off the bridge. Mr.. Clemons, Mr. Richardson and Mr. Gray were black and Mr. Winfrey was white.

. Mr. Richardson was not able to identify the other male in the group, but police later ascertained that the man was Mr. Winfrey.

. The master’did not make .a finding as to whether these.booking photographs.indicated trauma to Mr. Clemons’ face.

. By the time of Mr. Gray’s interrogation, Detective Pappas had finished his interrogation of Mr. Clemons and began interrogating Mr. Gray with - Detective Trevor. At some point during Mr. Gray's interrogation, Detective Brauer replaced Detective Trevor and completed the interrogation with Detective Pappas.

. ftlr. Gray’s trial ended on October 23, 1992, before Mr. Clemons’ suppression hearing began on February 1, 1993.

. While Mr, Clemons’ and Mr. Gray’s statements to the IAD. officers mirrored Mr. Cum-mins’ testimony that the police had used the unusual tactic of requiring the suspects to sit on their hands while beating them during the interrogations, Mr. Clemons did not testify about this tactic during the motion to suppress hearing so the trial court could not have recognized this similarity.

.Codefendant Mr. Winfrey, who was 15 years old at the time of the murders, pleaded guilty to two counts of second-degree murder, two counts of forcible rape, and one count of first-degree robbery, in exchange for a recommendation of a 30-year sentence from the state. Mr. Winfrey was released from prison in 2007.

. Jury instruction number 27 stated:
Evidence has been introduced "that the defendant made certain statements relating to the offense for which he is on trial.
If you find that a statement was made by the defendant, and that this statement was freely and voluntarily made under all of the circumstances surrounding and attending the making of the statement,, then you may give it such weight as you believe it deserves in arriving at.your verdict.
However, if you do not find and believe that the defendant made the statement, or if you do not find and believe that the statement was freely and voluntarily made under all the circumstances surrounding and attending the making of the statement, then you must disregard, it and give no weight in your deliberation,

, In separate trials, codefendant Gray was convicted of two counts of first-degree murder and sentenced to death on each count, and codefendant Richardson was convicted of one count of first-degree murder and one count of second-degree murder, Mr. Richardson was sentenced to death for first-degree murder and to life imprisonment for second-degree murder. Their convictions and sentences were affirmed on direct appeal, State v. Gray, 887 S.W.2d 369 (Mo. banc 1994); State v. Richardson, 923 S.W.2d 301 (Mo. banc 1996). Mr; Gray’s sentence was carried out in 2005: Mr. Richardson’s capital sentence was summarily set aside by this Court in State v. Richardson, No. SC76059, order entered October 29, 2003, because óf a constitutional violation ¿rising from the trial judge’s sentencing following a jury deadlock. See State v. Whitfield, 107 S.W.3d 253, 257-58 *72 (Mo. banc 2003) (applying the rule of law articulated in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), that only the jury may determine the aggravating factors for sentencing in capital cases).

. The district court found that the trial judge had improperly excused some potential jurors during jury selection and, on that ground, ordered that Mr. Clemons' death sentence be vacated and that he either be re sentenced to life without parole or given a new trial.

. Specifically, Mr. Clemons, in his actual innocence claim, alleges newly discovered evidence of the fact that $150,000 was, paid to settle the lawsuit Mr. Cummins filed in 1993 against members of the police department, in which he alleged they assaulted him in an attempt to coerce a confession. He argues this newly discovered' evidence supports his claim ' that his confession was ' physically coerced. Mr. Clemons, however, did not include this claim in the “Points Relied On” section of his brief to this Court. Accordingly, because Mr. Clemons did not include his “actual innocence” claim in his brief to this Court, it is considered waived and will not be addressed in this opinion. See Rule 84.04(d).

. The evidentiary hearing was delayed for several years due to difficulty in obtaining DNA results and the parties’ requests for additional discovery. Both parties consented to these delays to fully develop the record in the case.

. A petitioner seeking habeas relief under a cause and prejudice claim must show that his failure to comply with procedural rules was due to a “cause” external to the defense and this Court’s failure to review this claim would "prejudice” him. Woodworth v. Denney, 396 S.W.3d 330, 337 (Mo. banc 2013).

. During his deposition, Mr. Weeks testified that Mr. Lukanoff started laughing in response to his comment about Mr. Clemons’ injury possibly being from a spider bite. He testified that Mr. Lukanoff'told him "that’s— that kind of bump gets there when a..,.” .The, state then objected on the grounds of hearsay. His attorney voluntarily rephrased his question to Mr. \yeeks, and instead asked him what Mr, Lukanoff s reaction was. Mr. Weeks then testified without objection that Mr. Lukanoff was not surprised by the injury because "[h]e had seen them before" and that Mr. Lukanoff had been a police officer for five or 10 years. Mr. Lukanoff was not referenced in the I AD report so it is not known if he was interviewed during the IAD investigation. He did not testify at Mr. Clemons’ trial and, at the time of the master’s hearing, Mr. Lukanoff was deceased.

. The IAD report notes that Mr.' Clemons was interviewed several hours after his arrest by non-department employees working in the Pretrial Release Office but it does not accurately state what Mr. Weeks recorded in his report. The IAD report notes that Mr. Weeks said in his report that'- he -questioned Mr. Clemons regarding his general health and Mr, Clemons claimed his only health problem was asthma. The IAD report does not include the statement in Mr. Weeks' report that Mr. Clemons had a “bruise” or "bump.” The IAD report concluded that Mr. Clemons’ and Mr. Gray’s allegations that they were physically abused by police were not substantiated because there was insufficient evidence to either prove or disprove the allegations. The IAD report further concluded that Mr. Clemons’ allegation that the police had thrown away his first recorded statement was unfounded. Additionally, the IAD concluded that Mr. Clemons’ and Mr. Gray’s allegations that they had requested, but were denied, an attorney during questioning were unfounded.

. During the habeas hearing, Mr, Clemons asserted his Fifth Amendment privilege against self-incrimination in answering whether he: raped and/or assisted in raping the Kerry sisters; put one of the sisters and/or Mr. Cummins down the manhole; went down on the platform after the sisters and Mr. Cum-mins were placed there; forced the sisters and Mr. Cummins to get on the concrete pier; and told Mr. Gray and Mr. Winfrey that he *81 “threw them off the bridge.” The master stated that he drew an adverse inference from Mr. Clemons’ refusal to answer these questions and “inferred] ... if he were truthful, Clemons' answers to every one of those questions would have been damaging to him.” At trial, Mr. Clemons has a constitutional right to choose not to testify, and "the Constitution further guarantees that no adverse inferences are to be drawn from the exercise of this privilege.” Carter v. Kentucky, 450 U.S. 288, 305, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). As such, Mr. Clemons’ silence in-response to these questions cannot factor into this Court's determination whether the suppression of the Weeks evidence would have prejudiced Mr. Clemons at trial. See Carter, 450 U.S. at 305, 101 S.Ct. 1112.

. The dissent states “there is no likelihood that the trial court would have been swayed” by the Weeks evidence even if it had been presented at the motion to suppress hearing. As the dissent notes, the trial court found the police officers’ testimony credible. However, as the dissent also notes, a trial court's credibility findings are to be made after considering the reasonableness of the witness’s testimony in light of all the evidence in the case and whether the testimony may have been influenced by the witness’s interest, bias or prejudice. In this case, the trial court's credibility findings as to the officer’s testimony were made without the benefit of the Weeks evidence. By suppressing the Weeks evidence — the only evidence from a neutral party that supported Mr. Clemons’ claim that his confession was coerced — the state denied the trial court the opportunity to determine the reasonableness of the officers’ testimony and their credibility in light of the Weeks evidence. The totality of the evidence that the trial court will consider on remand will include the Weeks evidence and, therefore, it is likely that the trial court’s credibility findings will not be the same.

. Federal circuits are split on this point. See United States v. Harmon, 871 F.Supp.2d 1125, 1151-52 (D.N.M.2012), aff'd by United States v. Harmon, 742 F.3d 451 (10th Cir. 2014) (Circuit courts have split on the issue whether Brady v. Maryland's restrictions apply to suppression hearings[.]”). The Fifth and Ninth Circuits have held that Brady applies to suppression hearings. See Smith v. Black, 904 F.2d 950, 965-66 (5th Cir.1990), vacated on other grounds by Smith v. Black, 503 U.S. 930, 112 S.Ct. 1463, 117 L.Ed.2d 609 (1992); United States v. Barton, 995 F.2d 931, 935 (9th Cir.1993). The Fourth' and Seventh Circuits have assumed that Brady would apply to suppression hearings but have declined to decide the issue based on the facts presented in the cases. United States v. Williams, 10 F.3d 1070, 1077 (4th Cir.1993); United States v. Stott, 245 F,3d 890, 902 (7th Cir.2001). The District of Columbia Circuit, the Sixth Circuit and Tenth Circuit have questioned whether Brady applies to suppression hearings but also have declined to decide the issue. United States v. Bowie, 198 F.3d 905 (D.C.C.1999); United States v. Taylor, 471 Fed.Appx. 499, 520 (6th Cir.2012); United States v. Dahl, 597 Fed.Appx. 489, 491 n2 (10th Cir.2015).

. The dissent argues that there is overwhelming evidence of Mr, Clemons' guilt and so there is no likelihood that a jury would not have found Mr. Clemons guilty or would have imposed a sentence other than death. With similar evidence, a jury did, however, find Mr. Clemons' codefendant, Mr. Richardson, guilty of one count of first-degree murder and one count of second-degree murder and was unable to agree whether to sentence Mr. Richardson' to death. State v. Richardson, 923 S.W.2d 301, 308 (Mo, banc 1996).